ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV - 2 2010

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | § No. |
| | § |
| Michael Musacchio (1) | § |
| Joseph Taylor (Roy) Brown (2) | § |
| John Michael Kelly (3) | § |

3 - 1 0 C R 0 8 0 8 - P

### INDICTMENT

The Grand Jury Charges:

### Introduction

At all times material to this indictment:

1.      Exel Transportation Services, Inc. (Exel), formerly known as Mark VII Transportation Co., Inc. (Mark VII), had offices in Addison and Dallas, Texas, Memphis, Tennessee and elsewhere, and conducted business in the Northern District of Texas, Dallas Division, and elsewhere.

2.      Total Transportation Services LLC conducted business in the Northern District of Texas, Dallas Division, and elsewhere as Worldwide Total Transportation Services GP LLC and was the general partner of the entity operated as Total Transportation Services LP doing business as Worldwide Total Transportation Services LP.  Total Transportation Services LLC and Total Transportation Services LP operated as Total Transportation Services (TTS). TTS was formed on or about November 15, 2005.

3.      TTS and Exel were competitors.  Exel was a third party logistics company or intermodal marketing company which provided transportation and supply chain management products and services that facilitated the links between shippers and common carriers in the manufacturing, retail and consumer industries.  Exel entered into contracts with independent agents and independent sales agents.  Through these contractual arrangements and the utilization of in-house sales agents, Exel connected shipping customers with appropriate carriers and provided products, services and technology to assist its customers to transport goods.  TTS, as Exel's competitor, was also a third party logistics company which offered similar types of business services and products, and utilized similar types of contracts with independent agents and independent sales agents.

4.      **Michael J. Musacchio**, from in or about 1992, and continuing through on or about September 9, 2004, was employed by Exel and its predecessor Mark VII in high-level supervisory, management and officer positions.  From in or about 2000, through in or about September 9, 2004, **Musacchio** was the President and Chief Executive Officer of Exel.  **Musacchio** left his position with Exel on or about September 9, 2004.  From in or about November 2005 through in or about April 2006, **Musacchio** was employed by TTS as the President and CEO.  **Musacchio** was one of the initial Directors on the Board of Directors of TTS and held equity ownership in TTS.

5.      **Joseph Taylor Brown**, also known as **Roy Brown**, worked for Exel and its predecessor Mark VII from in or about August 1999 until on or about October 17, 2005.  At the time **Brown** left Exel, **Brown's** position was Vice President of Agency Support

which was primarily an Information Technology position. **Brown** agreed to accept a position with TTS on or about October 21, 2005, as the Vice President for Information Technology. From in or about October 2005 through in or about April 2006, **Brown** was employed by TTS. Before **Brown** left TTS, he held an equity ownership interest in TTS.

6.  **John Michael Kelly** worked for Exel from on or about October 2, 2000 until his resignation on or about October 27, 2005. At the time of his resignation, **Kelly** worked as the Senior Network Engineer for Exel. As an information technology specialist or network administrator, **Kelly** had administrator level access to all of the networked computers and internal email systems at Exel, including administrator-level access to Exel's computer network. After leaving Exel until on or about October 27, 2010, **Kelly** was employed as Manager IT-Infrastructure for TTS.

7.  At all times relevant to this indictment, the email servers of Exel were located at the corporate offices of Exel in Memphis, Tennessee. In addition, **Musacchio**, **Brown** and **Kelly**, while employed by Exel, worked at the Exel offices in Dallas, Texas and Addison, Texas. All Exel employees were bound by the Exel "Employment and Noncompete Agreement" and the "Exel Transportation Services, Inc. E-Mail and Telephonic Communications Employee Acknowledgment Form."

8.  Unindicted coconspirators no. 1, 4, and 5 were employees of Exel who became employees of TTS after **Musacchio** and **Brown** left Exel. Unindicted coconspirators no. 2 and 3 were financiers.

## Count One

### Conspiracy To Make Unauthorized Access to Protected Computer and To Exceed Authorized Access to Protected Computer
(Violation of 18 U.S.C. § 371 (conspiracy to violate 18 U.S.C. §§ 1030(a)(2)(C); (c)(2)(B)(i)-(iii) (unauthorized access and exceeding authorized access));

1.     The Grand Jury realleges and incorporates the allegations of paragraphs 1-8 of the Introduction to the Indictment.

### Object of the Conspiracy

2.     From at least in or about April 2004 and continuing through in or about March 2006, in the Dallas Division of the Northern District of Texas and elsewhere, defendants **Michael Musacchio, Joseph Taylor (Roy) Brown and John Michael Kelly,** aided and abetted by each other, did unlawfully, willfully, and knowingly combine, conspire, confederate and agree among themselves, with each other and with other persons known and unknown to the Grand Jury, to commit offenses against the United States, specifically, to intentionally access a computer without authorization and exceed authorized access to a protected computer, as defined at 18 U.S.C. § 1030(e)(2)(B), and thereby obtain information, and the offense was committed for purposes of commercial advantage and private financial gain and in furtherance of a criminal and tortious act in violation of the Constitution or laws of the United States or of any state, including the State of Texas, and the value of the information obtained exceeded $5,000, in violation of 18 U.S.C. § 371 (conspiracy to violate 18 U.S.C. §§1030(a)(2)(C); (c)(2)(B)(i)-(iii) (unauthorized access and exceeding authorized access to a protected computer)).

Manner and Means

A.     **Musacchio** and **Brown** made unauthorized access and exceeded authorized access to Exel's protected computers including the Exel mail server from their personal internet accounts, their assigned user accounts at the offices of TTS, and the administrator accounts at Exel, and obtained Exel emails, email attachments, and other business documents containing Exel's confidential and proprietary information.  They did so to provide a commercial advantage and private financial gain to TTS, themselves, **Kelly**, and the unindicted coconspirators.

B.     **Musacchio** and **Brown** obtained administrative passwords and login information to Exel's protected computers from **Kelly** and made unauthorized access and exceeded any authorized access to Exel's protected computers.  They did so to provide a commercial advantage and private financial gain to TTS, themselves, **Kelly** and the unindicted coconspirators.

C.     **Musacchio** directed unindicted coconspirators, who were employed by Exel during the time of the conspiracy, to exceed any authorized access to Exel's protected computers, and to obtain Exel's emails, email attachments, and other business documents containing Exel's confidential and proprietary information.  He did so to provide a commercial advantage and private financial gain to himself, TTS, **Brown**, **Kelly** and the unindicted coconspirators.

D.     **Brown** made unauthorized access to and exceeded his authorized access to Exel's protected computers and obtained Exel's emails, email attachments, and other business documents containing Exel's confidential and proprietary information. **Brown**

frequently forwarded Exel's confidential, proprietary emails and documents to **Musacchio** and other unindicted coconspirators. He did so to provide a commercial advantage and private financial gain to himself, TTS, **Musacchio, Kelly** and the unindicted coconspirators.

      E.     **Brown** obtained administrative passwords and login information to Exel's protected computers from **Kelly** and provided the passwords and login information to **Musacchio** to enable him to make unauthorized access to the protected computers of Exel and to defraud Exel of its proprietary information and business documents for the benefit of **Musacchio, Brown, Kelly**, the unindicted coconspirators and TTS.

      F.     **Kelly**, while employed by Exel, instructed an Exel IT employee that he should not change the administrative passwords on the Exel computer servers even after **Kelly** and **Brown** left Exel. The retention of the same administrative passwords provided continued unauthorized access to Exel's protected computers after **Kelly, Brown,** and **Musacchio** left Exel's employment and became employees of TTS, Exel's competitor.

      G.     **Kelly** provided the Exel passwords and login information to **Brown**. **Brown** provided the Exel passwords and login information to **Musacchio,** to enable **Brown, Kelly** and **Musacchio** to make unauthorized access to the protected computers of Exel. He did so to provide a commercial advantage and private financial gain to **Musacchio, Brown, Kelly**, the unindicted coconspirators, and TTS.

Overt Acts

    In furtherance of the conspiracy and to achieve its objects, defendants **Michael**

**Musacchio, Joseph Taylor (Roy) Brown, and John Michael Kelly** committed and

caused to be committed, among others, the following overt acts in the Northern District of

Texas, and elsewhere:

### 2004-2005

1.     In or about April 2004, **Musacchio** and unindicted coconspirators No. 2 and

3, discussed the funding for the formation of a new company, later to be called TTS (the

funding initiative was referred to as "Otra Vez"), which would compete with Exel in the

transportation services industry.  The participants agreed upon the initial management

group of TTS, and entered into an agreement to obtain Exel's proprietary and confidential

information for the benefit of TTS.

2.     On or about September 7, 2004, **Musacchio** resigned from his position as

president of Exel effective September 9, 2004.  On or about September 7, 2004,

**Musacchio** and **Brown** discussed how **Musacchio** could access Exel's protected

computers without authorization after **Musacchio** left Exel's employment.

3.     On or about September 30, 2004, **Musacchio** sent an email with attachment

to unindicted coconspirators No. 2 and 3 from his personal comcast.net account with the

message "here is the ETS 2005 budget plan."  The attachment was the budget plan which

was dated after **Musacchio** had left Exel.

4.     On or about December 21, 2004, **Brown** exceeded his authorized access to

the Exel email server and to the email account of an Exel employee known to the grand

jury.  **Brown** used his Blackberry and forwarded an email he had obtained from the Exel

employee's account to **Musacchio** at **Musacchio's** comcast.net account with the

**Indictment (Musacchio, Brown, Kelly) - Page 7**

message: "Some email between Jim and Andrew........Maybe ETS is for sale?"

5.      On or about January 7, 2005, **Brown** exceeded authorized access to the
Exel email server and to the account of a person known to the grand jury. **Brown** used
his bellsouth.net account to forward an email message from that account to **Musacchio** at
his comcast.net account with the subject line "You will enjoy this........" **Musacchio**
replied by email to **Brown** "This is great stuff! Thanks."

6.      On or about February 21, 2005, an Exel employee known to the grand jury
sent an email to **Musacchio** in which he asked **Musacchio** not to send items to his Exel
email account due to the "covertness of this operation."

7.      On or about April 22, 2005, **Brown**, while working at Exel, exceeded his
authorized access and accessed the Exel email accounts for Exel employees. **Brown**
obtained copies of email messages and attachments containing Exel proprietary business
plans which he forwarded to **Musacchi**o at **Musacchio's** comcast.net account.
**Musacchio** replied to  **Brown** by return email and made the following request: " "Roy, if
you can keep watch for replies to this email or anything else related to it, that would be
very helpful!" **Brown** responded "Doing my best."

8.      On or about May 16, 2005, **Musacchio** and an independent agent met with
other persons known to the grand jury to discuss a revised business plan for a new
business entity which would compete with Exel .

9.      On or about August 23, 2005, **Brown** and **Musacchio** exchanged emails in
which **Brown** provided **Musacchio** with Exel's proprietary agency information which he
had obtained from Exel's email accounts by exceeding his authorized access to Exel's

servers. **Musacchio** emailed **Brown** that "this will be helpful," then requested **Brown**

provide additional emails from the email account of Exel's president. **Brown** responded

that it was possible for him to provide additional emails from that account and asked if

there was specific information he should look for.

10.     On or about August 30, 2005, **Brown** exceeded his authorized access for

the email account of "Ets.Offices.All@Ets.Exel.Com" and forwarded an email message

sent from "bill.reed@ets.exel.com" to his home email account with bellsouth.net. **Brown**

then forwarded the message from his home account to **Musacchio** at **Musacchio's**

comcast.net account.

11.     On or about September 1, 2005, **Brown** emailed Exel's proprietary

information to **Musacchio** concerning the possible future acquisition of Exel.

**Musacchio** responded to **Brown** that "this . . . is going to fall right into our plan."

12.     On or about September 20, 2005, **Brown** exceeded his authorized access to

Exel's email server and to the account of the Exel president. He used his bellsouth.net

account to send a copy of an email from the president's Exel account concerning the

president's board presentation with an attached spreadsheet to **Musacchio** at

**Musacchio's** comcast.net account. **Musacchio** replied to **Brown** "you are the Man!"

13.     On or about September 20, 2005, **Brown** exceeded his authorized access to

Exel's email server and to the email account of Exel's president, and obtained a file

"Phantom Stock Option programme.xls." He then used his bellsouth.net account to send

the file to **Musacchio** at **Musacchio's** comcast.net account. **Musacchio** replied by email:

"You are on fire!  Take a look at Toad's email and see if he is sucking up to Jim!"

**Brown** then responded: "he is about as much out of the loop as Steve. I have looked but to no great findings [sic]."

14.     Beginning on or about September 20, 2005 and continuing through March 25, 2006, a TTS user account assigned to **Brown** used the TTS servers to log onto the Exel servers. Brown exceeded his authorized access to Exel servers in this manner prior to leaving Exel on October 17, 2005, and acted without authorized access after that date. While logged on, the TTS account accessed the email accounts of Exel's president, vice president and other Exel employees more than 300 times.

15.     On or about September 21, 2005, **Brown** exceeded his authorized access to the Exel email server and to the email account of the Exel president. He used  his bellsouth.net account to forward an email from the Exel president to another employee's account to **Musacchio** at **Musacchio's** comcast.net account with the subject line "From Jim to Andrew." On that date **Brown** also exceeded authorized access to the Exel email server, and used his bellsouth.net account to forward to **Musacchio** at **Musacchio's** comcast.net account an email with attachments concerning proposed corporate changes which was sent from the Exel president to "Andrew/Tony."

16.     On or about October 10, 2005, **Brown** exceeded authorized access to the Exel email server. **Brown** sent an email from his bellsouth.net account to **Musacchio** at **Musacchio's** comcast.net account with the subject line: "Interesting reading........"

17.     On or about October 10, 2005, **Brown** exceeded his authorized access to the Exel email server and to the email account of Exel's president. **Brown** forwarded a copy of an email from the president's account to **Musacchio**. **Musacchio** replied to

**Brown**, "This is great! . . . as long as Exel has something else to focus on, it will keep us off of their radar screen! . . . .Isn't there a way(when the time is right for us to write and email as Brad to Jim and really make some bogus shit up for them to get excited about? [sic]" **Brown** responded "Yes and it sounds like fun . . . that would really [expletive deleted] with their heads!" **Musacchio** then emailed to **Brown** "I would like to compose an email from Brad to Jim. Can we do it and not have it traced?" On or about October 11, 2005, **Brown** responded "Yes, of course."

18.    On or about October 14, 2005, **Brown** exceeded his authorized access to Exel's email server and to the email account of Exel's president. **Brown** used his bellsouth.net account and forwarded an email from the president's account to **Musacchio** at **Musacchio's** comcast.net account with the subject line: "RE: You will enjoy this......." **Musacchio** replied by email and wrote: "Thanks. Now the next question is, how are we going to get into email after you leave?" **Brown** replied: "Not a problem..........I have the back door password that only I know and no one else can change." **Musacchio** emailed back to **Brown** "beauty!"

19.    On or about October 14, 2005, **Musacchio** emailed **Brown** from his comcast.net account with the subject line "Follow Up," and asked **Brown** to "Please keep looking in Brad's email to see if there id [sic] any information being passed to him from Frito-Lay about a meeting I will be having with them. Thanks."

20.    On or about October 26, 2005, **Brown** sent **Musacchio** an email from Exel Legal Counsel to Exel's president that he obtained by an unauthorized access to Exel's email server. The email to **Musacchio** had the subject line "from Dick to Jim." On the

same date, **Musacchio** forwarded the email to unindicted coconspirator no. 2.

21.     On or about October 29, 2005, **Musacchio** emailed **Brown** and directed "When you are perusing Jim or Andrew's email, please look for monthly/weekly financials. Thanks." **Brown** replied by email "What month do you want? I have everything up until I left which is through September. October numbers will be next week."

22.     In or about October 2005, before **Brown** left Exel's employment, **Kelly** showed **Brown** how to access Exel's email system via the internet. **Kelly** showed **Brown** how to use an administrator-level account to access Exel employees' individual email accounts.

23.     On or about October 27, 2005, **Musacchio** forwarded an email to a person known to the grand jury which had been obtained without authorization from Exel servers. The email which **Musacchio** forwarded was from Exel counsel to the Exel president concerning the fact that no Federal Maritime Commission Application existed for **Musacchio**.

24.     On or about November 1, 2005, **Brown** made unauthorized access to the Exel email server and accessed the email account of the Exel president. He then used his bellsouth.net account to forward an email from the president's account to **Musacchio** at **Musacchio's** comcast.net account with the subject line: "How funny is this shit!"

25. On or about November 3, 2005, unindicted coconspirator no. 1 used her Hotmail account and sent an email to **Musacchio** containing information about phone calls she had overheard the company president making at Exel's office. **Musacchio**

thanked her and told her "this is good stuff." **Musacchio** then used his comcast.net email

account to email **Brown** with the subject line "FW: Edie, and other misc. gossip."  In the

email **Musacchio** wrote: "Confidential to you, but stay close to Jim's email.  This is

going to get interesting!  Please do not let [unindicted coconspirator no. 1] know that I

passed this to you!  Thanks."  **Brown** responded from his bellsouth.net email account and

stated ". . . I will get back in the email and see what all is taking place."

26.     On or about November 7, 2005, **Brown** made unauthorized access to the

Exel email server and accessed the email account of the Exel president.  He then used his

bellsouth.net account to forward an email in the president's account to **Musacchio** at

**Musacchio's** comcast.net account with the the subject line: "From Jim to

Dan/Andrew/Tony."  **Musacchio** then sent the email to unindicted coconspirator no. 1

with the message,"You didn't see this. ok."

27.     On or about November 8, 2005, **Brown** made an unauthorized access to

Exel's email server and the account of Exel's president and copied an email from the

account.  **Brown** then emailed **Musacchio** at **Musacchio's** comcast.net account the email

he had copied from Exel's server with the subject line "Talk between Jim and Dan."  On

or about November 9, 2005, **Musacchio** forwarded this email to his wife and admonished

her not to say anything about what he was doing.

28.     On or about November 9, 2005, **Brown** made an unauthorized access to

Exel's email server and to the email account of Exel's president.  **Brown** forwarded a

copy of an email string between Exel's president and Exel's Legal Counsel which had the

subject line "Organizational Announcement" to **Musacchio** with his subject line "They

have no idea!!!!!!!!"

29.    On or about November 11, 2005, **Kelly**, began training an Exel employee to replace him. **Kelly** told the Exel employee how to maintain and operate the computer systems at Exel and instructed him not to change the system passwords.

30.    On or about November 20, 2005, **Musacchio** sent an email to unindicted coconspirator no. 5, an Exel employee, to thank him for sending Exel's proprietary "Salesperson Comparison" information to him and asking whether he also had YTD figures for sales personnel. 5 had sent the Exel proprietary information without authorization.

31.    On or about November 21, 2005, unindicted coconspirator no. 4, an Exel employee, contacted **Musacchio** concerning a directive he had received from the Exel President and CEO regarding agents. On that date, **Musacchio** emailed unindicted coconspirator no. 2 requesting a meeting to discuss a TTS Board of Directors' resolution that **Musacchio** believed was needed.

32.    Beginning on or about November 23, 2005, and continuing through on or about February 12, 2006, the TTS user account belonging to **Musacchio** was used to log onto the Exel mail servers without authorization and to access the email accounts of Exel employees approximately 3,000 times.

33.    On or about November 24, 2005, **Musacchio** emailed **Brown** from his TTS email account to inform **Brown** that the Exel web mail server was down and he could not access the email accounts of Exel employees. **Musacchio's** message read: "When you get a chance, try to get onto ETS's Webmail. Everything was fine last night, but tonight I

get an error message that says "Failed to Connect to Mail Server". I didn't do anything

that would lock me out. Maybe the server is down?" On November 25, 2005, **Brown**

replied to **Musacchio** from his TTS email account that : "Looks like the server is down

..........guess we will have to wait until someone figures that out." **Musacchio** replied:

"ok, thanks." Later **Brown** emailed **Musacchio** to let him know that he had restarted the

Exel email server remotely and said "It's working now ..........I restarted it remotely..........I

guess they have not changed a single password!"

34.    On or about November 26, 2005, **Musacchio** emailed other persons known

to the grand jury, and attached a copy of a confidential Exel memo describing Exel's 2006

Agent Retention/Incentives for keeping agents.

35.    On or about November 28, 2005, a person known to the grand jury emailed

**Musacchio** and expressed his concern about the legal risks of sending and receiving Exel

documents and stated, "We don't want to give Exel grounds for legal action."

### 2006

36.    On or about January 6, 2006, **Brown** sent an email to **Musacchio** in which

he wrote "Go into the "email" and look at the sent items for JD."

37.    On or about January 6, 2006, **Brown** made unauthorized access to the Exel

email servers, to the account of a person known to the grand jury, and then emailed

**Musacchio** information from the email concerning a hold on the checks of sales agents.

38.    On or about January 7, 2006, **Musacchio** sent an email to **Brown**,

unindicted coconspirators no. 1, no. 3, and other persons known and unknown to the

grand jury, in which he asked that they keep "confidential information" that he had

provided to them a secret. **Musacchio** warned them that disclosure of the confidential information would "destroy other people's careers."

39.     On or about January 7, 2006, **Brown** signed an employment offer letter accepting employment with TTS which was countersigned by **Musacchio** as President and CEO of TTS and which stated that his employment with TTS became effective on October 24, 2005.

40.     On or about January 7, 2006, **Musacchio** sent an email to **Brown** with the subject line "ETS Email" and the message "Do you think we are locked out forever??"

41.     On or about January 8, 2006, **Brown** sent **Kelly** an email stating "Hey, my back door to you know where is locked out. Do you know another way in?" On or about January 8, 2006, **Kelly** replied to **Brown** via email with the user names and passwords for the "Exchange_service," "BESAdmin," and "Delano.service" administrator-level accounts that enabled **Brown** to make unauthorized access to Exel's protected computers. Brown emailed **Musacchio** later with the subject line "Back door Success" and wrote "I AM IN!!!!!!!!!! Several hours later I can see again!"

42.     On or about January 12, 2006, **Musacchio** emailed **Brown** with the subject line "Load Tech" and with a message that an Exel employee "found out we are using Load Tech." **Brown** replied by email "Do you know how?" **Musacchio** then emailed **Brown** the message "Email said someone told her." **Brown** emailed back to **Musacchio** ". . . I will look in her email tomorrow."

43.     On or about January 17, 2006, **Musacchio** sent an email to **Brown** with a subject line "Go hunting." The message indicated that **Musacchio** wanted **Brown** to look

at the email boxes of the Exel president, legal counsel, vice president and another officer. **Brown** responded that he was heading to dinner, but that when he got to the apartment he would "dig deep."

44.     On or about January 18, 2006, **Brown** made an unauthorized access to the Exel email server and the account of the Exel president.  **Brown** sent an email to **Musacchio** with the subject line "Unbelievable email between Jim and Dick...............they are paranoid!" to which he attached an email exchange between the Exel president and Exel legal counsel.

45.     On or about January 20, 2006, **Brown** made an unauthorized access to the Exel email server and obtained the Exel Weekly update, Exel's proprietary document, which he emailed to **Musacchio** and unindicted coconspirator no. 1.

46.     On or about January 21, 2006, **Brown** made unauthorized access to Exel's email server and to the email account of Exel's legal counsel.  He then forwarded a message taken from that account with the subject line "RE: From Dick Merrill to an outside attorney" to **Musacchio**.

47.     On or about January 21, 2006, **Musacchio** made unauthorized access to the Exel email servers and to the account of Exel's legal counsel.  He then forwarded an email which had been sent by Exel's legal counsel to another and which discussed the possibility of Exel's phones being tapped.  **Musacchio** then forwarded the email to **Brown** and discussed it in a series of emails.  On January 21, 2006, **Musacchio** emailed **Brown** and told him to "delete everything I sent you - I am now deleting everything you and I correspond [sic] as soon as I read it."

48.     On or about February 3, 2006, **Musacchio** emailed **Brown** with the subject line "Levi sent email info to Damman - DELETE AFTER READING."

49.     On or about February 23, 2006, **Brown** made an unauthorized access to the Exel email servers and to the email account of Exel's president. After making the unauthorized access, **Brown** forwarded to **Musacchio** a confidential email between Exel's president and a person known to the grand jury which had been sent by the president on or about February 22, 2006 with the subject "Re: Confidential - PepsiCo/Frito Lay." **Musacchio** responded to **Brown** at his email account at bellsouth.net from **Musacchio's** email account at TTS.

50.     On or about February 23, 2006, **Brown** made an unauthorized access to the Exel email server and to the email account of Exel's president. After making the unauthorized access, **Brown** forwarded a confidential email between Exel's president and Exel's vice president which had been sent by the president on or about February 22, 2006 with the subject "RE: Thanks" to **Musacchio**. **Musacchio** responded to **Brown** at his email account at bellsouth.net from **Musacchio's** email account at TTS.

51.     On or about February 23, 2006, **Brown** made an unauthorized access to the Exel mail server and to the email account of an Exel employee. After making the unauthorized access, **Brown** forwarded a confidential email string between Exel's president and another Exel employee known to the grand jury to **Musacchio** with the subject line "Long..........but good." **Musacchio** used his email account at TTS, and replied to **Brown** at **Brown's** email address at bellsouth.net and included the message "This is a good one! Looks like we are in good shape. Sent From Blackberry Handheld,

Please Excuse Typos."

52.    On or about February 23, 2006, **Brown** made an unauthorized access to the Exel mail server and to the email account of Exel's president. After making the unauthorized access, **Brown** forwarded a confidential email which was copied to the president and others known to the grand jury to **Musacchio** with the subject line "He sounds pist! [sic]." **Musacchio** replied from his email account at tts-us.com to **Brown** at his email account at bellsouth.net with the message "Maybe time to call him?..."

53.    On or about February 23, 2006, **Brown** made an unauthorized access to the Exel mail server and to the email account of an Exel employee. After making the unauthorized access, **Brown** forwarded a confidential email between Exel's president and another person known to the grand jury which had the subject line "Re: American Suzuki." The content of the email discussed the loss of an account for American Suzuki to **Musacchio**. **Musacchio** used his email account at TTS and replied to **Brown** via email at his bellsouth.net with the statement "Well, now they know. . . ."

54.    On or about February 23, 2006, **Brown** made an unauthorized access to the Exel email server and to the account of Exel's president. After making the unauthorized access, **Brown** forwarded a copy of a confidential email between Exel's president and a person known to the grand jury which had a subject line "Key People," and which discussed providing an incentive to prevent losing key personnel to **Musacchio**. **Musacchio** used his TTS email account to reply to **Brown** at his bellsouth.net account with the message: "Throw more money after something we are not after!..."

55.    On or about February 24, 2006, **Brown** made an unauthorized access to the Exel email servers and to the account of Exel's vice president.  After making the unauthorized access, **Brown** forwarded a confidential email to **Musacchio**.  The confidential email was between the vice president and another person known to the grand jury which had been sent by the vice president on or about that date with the subject line "Letter going to West Farm."  **Musacchio** replied to **Brown** at his bellsouth.net on the same date from his email account at tts-us.com. In an exchange of emails, **Musacchio** responded to **Brown** "...We cannot do anything unwise at this time."

56.    On or about February 25, 2006, **Brown** made an unauthorized access to the Exel email servers and to the email account of an Exel employee and obtained an email that Exel's president and another Exel employee had received on that date from the vice president. The email to the president contained the subject line "FW: update information on the action items of the day."   After making the unauthorized access, **Brown** forwarded a copy of the email to **Musacchio** with a blank subject line.  **Musacchio** replied to **Brown's** email account at Brown's bellsouth.net account from his email account at tts-us.com.

57.    On or about March 7, 2006, **Brown** made an unauthorized access to the Exel email servers and to the email account of Legal Counsel for Exel.  **Brown** used his email account at bellsouth.net, and forwarded to **Musacchio** at his TTS email account, correspondence from Exel Legal Counsel to another person known to the grand jury with subject line "RE: Personal Computer - Chain of Custody" which described Exel's internal investigation into data breaches at Exel, including the unauthorized destruction of data by

**Brown** and unauthorized removal of equipment by **Kelly**.

58.     On or about March 16, 2006, **Brown** made unauthorized access to Exel email servers, after which he sent **Musacchio** a copy of a confidential internal Exel email, with the subject line "Remember to completely delete" and the email sensitivity as "Private." The email was responded to by **Musacchio** from an email account assigned to him by TTS, and was sent to an email account assigned to **Brown** by TTS. **Musacchio's** response was "Well!  We are getting into better and better position!  Thank you for getting this info."

59.     On or about March 17, 2006, **Brown** made an unauthorized access to the Exel email servers and to the account of Exel's president, and obtained Exel's proprietary information contained in internal emails between Exel's president and a person known to the grand jury.  On or about March 18, 2006, **Musacchio** and **Brown** exchanged emails with the subject line "Re: Very long but very good information" in which they debated the merits of an email chain between Exel employees which discussed an important Exel client.

60.     On or about March 18, 2006, **Brown** made unauthorized access to the Exel email server and to the account of Exel's president.  **Brown** sent a copy of emails between the president and others known to the grand jury to **Musacchio** from his email account at bellsouth.net with the subject line "Dan is outa there!"  **Musacchio** replied to **Brown's** email from his email account at TTS.

61.     On or about March 24, 2006, in an email string between **Musacchio** and **Brown, Musacchio** instructed **Brown** "if you go fishing, please look for anything about

Mitsubishi quotes by someone." **Brown** replied "I am <u>fishing</u> right now actually. Lisa and Julie disappeared from the meeting and Todd thinks they are over at out office...." **Musacchio** responded "they are." Later that day, **Brown** emailed **Musacchio** with the subject line "Bad News" and informed him "it appears my fishing hole has dried up ...no more fishing." **Musacchio** responded "Why?"

All in violation of 18 U.S.C. § 371 (conspiracy to violate 18 U.S.C. §§1030(a)(2)(C);(c)(2)(B)(i)-(iii) (unauthorized access and exceeding authorized access to protected computer)).

Counts 2 - 22

Exceeding Authorized Access to Protected Computers
(Violation of 18 U.S.C. §§1030(a)(2)(C); (c)(2)(B)(i)-(iii) and 1030(b))
Aiding and Abetting
(Violation of 18 U.S.C. § 2)

1.     The grand jury hereby realleges and incorporates the allegations set out in
paragraphs 1-8 of the Introduction and Count 1 of the Indictment.

2.     On or about the dates indicated below, for each count below, in the Dallas
Division of the Northern District of Texas and elsewhere, defendant, **Joseph Taylor
(Roy) Brown,** aided and abetted by defendant **John Michael Kelly**, did knowingly and
intentionally access without authorization, and attempted to access without authorization,
a protected computer as defined at 18 U.S.C. § 1030(e)(2)(B), specifically, to
intentionally access a computer without authorization, and thereby obtain information,
and the offense was committed for purposes of commercial advantage and private
financial gain and in furtherance of a criminal and tortious act in violation of the U. S.
Constitution or laws of the United States or of any state, including the State of Texas,
and the value of the information obtained exceeded $5,000, in violation of 18 U.S.C.
§§1030(a)(2)(C); (c)(2)(B)(i)-(iii), and as a direct result accessed emails and attached
documents contained in the email accounts of Exel officers and employees, as described
below:

| COUNT | DATE | EXEL EMAIL ACCOUNT(S) |
|---|---|---|
| 2 | 11/07/2005 | Exel's President |
| 3 | 11/08/2005 | Exel's President |
| 4 | 11/09/2005 | Exel's President |
| 5 | 01/06/2006 | Exel's President |
| 6 | 01/08/2006 | Exel's President |
| 7 | 01/18/2006 | Exel's President |
| 8 | 01/20/2006 | Exel Server |
| 9 | 01/21/2006 | Exel's Legal Counsel |
| 10 | 02/23/2006 | Exel's President |
| 11 | 02/23/2006 | Exel's President |
| 12 | 02/23/2006 | Exel's President |
| 13 | 02/23/2006 | Exel's President |
| 14 | 02/23/2006 | Exel's President |
| 15 | 02/23/2006 | Exel's President |
| 16 | 02/24/2006 | Exel's Vice-President |
| 17 | 02/25/2006 | Exel Server |
| 18 | 03/07/2006 | Exel's Legal Counsel |
| 19 | 03/16/2006 | Exel Server |
| 20 | 03/17/2006 | Exel's President |
| 21 | 03/18/2006 | Exel's President |
| 22 | 03/18/2006 | Exel's Vice President |

All in violation of 18 U.S.C. §§ 1030(a)(2)(C); (c)(2)(B)(i)-(iii) and 2.

## Counts 23 - 24

### Unauthorized Access to Protected Computers
(Violation of 18 U.S.C. §§1030(a)(2)(C); (c)(2)(B)(i)-(iii) )

1.      The grand jury hereby realleges and incorporates the allegations set out in paragraphs 1- 8 of the Introduction and Count 1 of the Indictment.

2.      On or about the dates indicated below, for each count below, in the Dallas Division of the Northern District of Texas and elsewhere, defendant, **Michael Musacchio**, did knowingly and intentionally access without authorization, and attempted to access without authorization, an Exel protected computer, as defined at 18 U.S.C. § 1030(e)(2)(B), specifically, to intentionally access a computer without authorization, and thereby obtain information, and the offense was committed for purposes of commercial advantage and private financial gain and in furtherance of a criminal and tortious act in violation of the Constitution or laws of the United States or of any state, including the State of Texas, and the value of the information obtained exceeded $5,000, in violation of 18 U.S.C. §§1030(a)(2)(C); (c)(2)(B)(i)-(iii), and as a direct result accessed emails and attached documents contained in the email accounts of Exel officers and employees, as described below:

| COUNT | DATE | EXEL EMAIL ACCOUNT(S) |
|-------|------|------------------------|
| 23 | 11/24/2005 | Exel Server |
| 24 | 01/21/2006 | Exel's Legal Counsel |

All in violation of 18 U.S.C. §§1030(a)(2)(C); (c)(2)(B)(i)-(iii).

A TRUE BILL

FOREPERSON

JAMES T. JACKS
UNITED STATES ATTORNEY
By:

LINDA C. GROVES
Assistant United States Attorney
Texas Bar No. 08553100
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: 214.659.8600
Facsimile: 214.767.2846
Linda.Groves@usdoj.gov

MONA SEDKY
Trial Attorney
Computer Crime Intellectual Property Section
U. S. Department of Justice
Washington, D.C. 20005
Phone - (202) 353-4304
Fax - (202) 514-6113
Mona.Sedky@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.

**MICHAEL MUSACCHIO (1)**
**JOSEPH TAYLOR (ROY) BROWN (2)**
**JOHN MICHAEL KELLY (3)**

INDICTMENT

18 U.S.C. § 371 and (18 U.S.C. § 1030(a)(2)(C); (c)(2)(B)(i)-(iii))
Conspiracy to Make Unauthorized Access to Protected Computer
and to Exceed Authorized Access to Protected Computer

18 U.S.C. §§ 1030(a)(2)(C); (c)(2)(B)(i)-(iii) and1030(b)
Exceeding Authorized Access to Protected Computers
18 U.S.C. § 2
Aiding and Abetting

18 U.S.C. §§ 1030(a)(2)(C); (c)(2)(B)(i)-(iii)
Unauthorized Access to Protected Computers

24 Counts

A true bill rendered:

--------------------------------------------------------------------------------

DALLAS                                                                                FOREPERSON
Filed in open court this 2ⁿᵈ____day of November, A.D. 2010.

--------------------------------------------------------------------------------

Clerk
**WARRANT TO ISSUE AS TO DEFENDANTS:  MICHAEL MUSACCHIO,**
**JOSEPH TAYLOR (ROY) BROWN and JOHN MICHAEL KELLY**

--------------------------------------------------------------------------------

UNITED STATES  DISTRICT/MAGISTRATE JUDGE

Magistrate Case Number pending:3:08-MJ-135 (Search Warrant)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

**Related Case Information**

Superseding Indictment: ☐ Yes ☒ No   New Defendant: ☒ Yes ☐ No

Pending CR Case in NDTX: ☐ Yes ☒ No   If Yes, number:

Search Warrant Case Number : 3:08-MJ-135

R 20 from District of

Magistrate Case Number: N/A

1. **Defendant Information**

Juvenile: ☐ Yes ☒ No

If Yes, Matter to be sealed:

☐ Yes ☒ No

Defendant Name                    **MICHAEL MUSACCHIO (1)**

Alias Name

Address

County in which offense was committed:          Dallas, Texas

**3-10CR0308-P**

2. **U.S. Attorney Information**

**AUSA LINDA C. GROVES**          **Texas Bar No. 08553100**

3. **Interpreter**

☐ Yes ☒ No   If Yes, list language and/or dialect:

4. **Location Status WARRANT TO ISSUE**

Arrest Date -

☐ Already in Federal Custody
☐ Already in State Custody
☐ On Pretrial Release

5. **U.S.C. Citations**

Total # of Counts as to This Defendant:   **3**   ☐ Petty   ☐ Misdemeanor   ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 371 and (18 U.S.C. § 1030(a)(2)(C); (c)(2)(B)(i)-(iii)) | Conspiracy to Make Unauthorized Access to Protected Computer and to Exceed Authorized Access to Protected Computer | 1 |
| 18 U.S.C. §§ 1030(a)(2)(C); (c)(2)(B)(i)-(iii) | Unauthorized Access to Protected Computers | 23-24 |

Date: November 1, 2010          Signature of AUSA: *Linda C Groves*
                                              LINDA C. GROVES

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| Related Case Information |
|---|
| Superseding Indictment: ☐ Yes ☒ No    New Defendant: ☒ Yes ☐ No |
| Pending CR Case in NDTX: ☐ Yes ☒ No  If Yes, number: |
| Search Warrant Case Number : 3:08-MJ-135 |
| R 20 from District of |
| Magistrate Case Number: N/A |

1.  **Defendant Information**

Juvenile:  ☐ Yes ☒ No

If Yes, Matter to be sealed:

☐ Yes   ☒ No

Defendant Name  **JOSEPH TAYLOR (ROY) BROWN (2)**

Alias Name

Address

County in which offense was committed:  Dallas, Texas

2.  **U.S. Attorney Information**

**AUSA LINDA C. GROVES**

**3-10CR0308-P**

**Texas Bar No. 08553100**

3.  **Interpreter**

☐ Yes   ☒ No    If Yes, list language and/or dialect:

4.  **Location Status WARRANT TO ISSUE**

Arrest Date -

☐ Already in Federal Custody
☐ Already in State Custody
☐ On Pretrial Release

5.  **U.S.C. Citations**

Total # of Counts as to This Defendant:    **23**    ☐ Petty  ☐ Misdemeanor  ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 371 and (18 U.S.C. § 1030(a)(2)(C); (c)(2)(B)(i)-(iii)) | Conspiracy to Make Unauthorized Access to Protected Computer and to Exceed Authorized Access to Protected Computer | 1 |
| 18 U.S.C. §§ 1030(a)(2)(C); (c)(2)(B)(i)-(iii) and 1030(b); 18 U.S.C. § 2 | Exceeding Authorized Access to Protected Computers Aiding and Abetting | 2-22 |

Date: November 1, 2010

Signature of AUSA:  *Linda C. Groves*

LINDA C. GROVES

| | |
|---|---|
| **UNITED STATES DISTRICT COURT**<br>**NORTHERN DISTRICT OF TEXAS** | **Related Case Information**<br><br>Superseding Indictment: ☐ Yes ☒ No   New Defendant: ☒ Yes ☐ No<br><br>Pending CR Case in NDTX: ☐ Yes ☒ No  If Yes, number:<br><br>Search Warrant Case Number : 3:08-MJ-135<br><br>R 20 from District of<br><br>Magistrate Case Number: N/A |

1.  **Defendant Information**

    Juvenile: ☐ Yes ☒ No

    If Yes, Matter to be sealed:

    ☐ Yes   ☒ No

    Defendant Name          **JOHN MICHAEL KELLY (3)**

    Alias Name

    Address

    County in which offense was committed:          Dallas, Texas

2.  **U.S. Attorney Information**

    **AUSA LINDA C. GROVES**

    **3-10CR0308-P**

    Texas Bar No. 08553100

3.  **Interpreter**

    ☐ Yes   ☒ No    If Yes, list language and/or dialect:

4.  **Location Status WARRANT TO ISSUE**

    Arrest Date -

    ☐ Already in Federal Custody
    ☐ Already in State Custody
    ☐ On Pretrial Release

5.  **U.S.C. Citations**

    Total # of Counts as to This Defendant:    **23**    ☐ Petty  ☐ Misdemeanor  ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 371 and<br>(18 U.S.C. § 1030(a)(2)(C);<br>(c)(2)(B)(i)-(iii)) | Conspiracy to Make Unauthorized Access<br>to Protected Computer and to Exceed<br>Authorized Access to Protected Computer | 1 |
| 18 U.S.C. §§ 1030(a)(2)(C);<br>(c)(2)(B)(i)-(iii) and 1030(b);<br>18 U.S.C. § 2 | Exceeding Authorized Access to Protected<br>Computers<br>Aiding and Abetting | 2-22 |

Date: November 1, 2010          Signature of AUSA: *Linda Groves*

LINDA C. GROVES