IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA ) CAUSE NO. 3:10-CR-308-P (1)
(
vs. )
( AUGUST 15, 2012
) DALLAS, TEXAS
MICHAEL MUSACCHIO ( 9:00 A.M.

---

HEARING ON MOTION TO SUPPRESS
HEARING ON MOTIONS IN LIMINE

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE

---

SHAWN M. McROBERTS, RMR, CRR
1100 COMMERCE STREET, RM. 1654
DALLAS, TEXAS 75242
(214) 753-2349

A P P E A R A N C E S

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
1100 COMMERCE, 3RD FLOOR
DALLAS, TEXAS 75242
(214) 659-8600
BY: MS. LINDA GROVES

FOR THE DEFENDANT: UNITED STATES ATTORNEY'S OFFICE
1301 NEW YORK AVENUE NW
SUITE 600
WASHINGTON, DC 20005
(202) 616-3475
BY: MR. RICHARD GREEN

FOR THE DEFENDANT: LAW OFFICES Of JAY ETHINGTON
3131 McKINNEY AVENUE, SUITE 800
Dallas, TEXAS 75204
(214) 740-9955
BY: MR. JAY ETHINGTON
MR. REID MANNING
MR. BILL DUNNE

OFFICIAL COURT REPORTER: SHAWN M. McROBERTS, RMR, CRR
1100 COMMERCE STREET, RM. 1654
DALLAS, TEXAS 75242
(214) 753-2349

# INDEX

## EXAMINATION


| Witness Name | Page |
|---|---|
| ALLYN LYND | |
| Direct By MR. ETHINGTON | 6 |
| Cross By MR. GREEN | 61 |
| Redirect By MR. ETHINGTON | 76 |

| Government Exhibits | Page |
|---|---|
| No. 219 Admitted into Evidence | 62 |

| Defendant Exhibits | Page |
|---|---|
| No. 16 Admitted into Evidence | 29 |
| No. 17 Admitted into Evidence | 37 |

THE COURT: Good morning.

All right. Call this case on the Defendant's motion to suppress, the Defendant's motion for a *Daubert* hearing, and various motions in limine.

Is the Government ready?

MS. GROVES: The Government is ready.

THE COURT: Mr. Ethington?

MR. ETHINGTON: Yes, Your Honor.

THE COURT: Why don't we start off with the motion to suppress, and you may proceed.

MR. ETHINGTON: May I introduce people in the courtroom here with us.

THE COURT: Yes.

MR. ETHINGTON: This is Reid Manning. He got his law license a few months ago and is working in our office. And Bill Dunne has been practicing for some time, and he had represented Mr. Musacchio in the civil matter along with Henry Simpson, who practices -- All of these people are admitted to this Court. And Mr. Simpson was primarily responsible for the representation in the civil case that preceded this criminal case for Mr. Musacchio. That is who we have here.

THE COURT: Thank you.

All right. Mr. Ethington, you may proceed.

MR. ETHINGTON: Your Honor, we would call as our witness in the motion to suppress Agent Allyn Lynd.

MR. GREEN: Objection, Your Honor. We have no notice from Mr. Ethington as to who he is calling. We have asked several times as to who he is calling. I would ask for an offer of proof as to what he intends to use Agent Lynn for.

MR. ETHINGTON: Judge, he is the case agent, and he is going to testify in the -- He has been designated as an expert witness and he is going to testify in further proceedings. There is no surprise here.

THE COURT: You are calling him on your motion to suppress?

MR. ETHINGTON: Yes.

THE COURT: Agent, if you would come around and take the witness stand, please, sir.

(Whereupon, the oath was administered by the Court.)

ALLYN LYND,

Testified on direct examination by Mr. Ethington as follows:

Q. Agent Lynd, we all know and respect who you are and what your position is, but for the record purposes tell us your full name?

A. Yes, sir. It is Special Agent Allyn Lynd--L-Y-N-D. I have been with the FBI about a little over 16 years now, and I have been on the Cyber Squad for about 15.

Q. Very good. And you are the case agent in this United States versus Musacchio and others?

A. I am, sir.

Q. And have been from the inception of the case, I take it?
A. Yes, sir, I have.
Q. Okay. And case agent, just for record purposes, is primarily responsible for coordinating investigation, making some management decisions, and charged with the knowledge, generally speaking, of the investigative activities in the case. Is that right?
A. With everything except for the management decision. That is generally our supervisor. But as far as the investigation itself, operationally, tactically, yes.
Q. And, of course, those decisions are also made by -- in conjunction with the U.S. Attorney's Office?
A. Yes, sir.
Q. Okay. And very briefly, if you would, because again, I think we all know your background, but just for record purposes, what is your training or experience in the investigation of what you call Cyber Crimes?
A. I have -- A lot of OJT, obviously, for the last 15 years. I have taken all the courses that the Bureau provides in it. I have taken some outside training with FTK, some other software venders. I have attended log analysis. I have attended classes on wireless hacking wireless hackers, analysis of router logs. I have certifications from CompTIA, who is one of the certification authorities; other things along the same lines, sir.

MR. GREEN: Your Honor, the Government will stipulate that Agent Lynd is an expert, if that is where Mr. Ethington is going.

MR. ETHINGTON: That is not where I am going, Your Honor; just some general background of what his experience is.

THE COURT: All right.

Q. (BY MR. ETHINGTON) Can you tell us, please, whether or not you are familiar with the procedures that the FBI has for the identification, collection of what I will call electronically stored information?

A. In general, yes, sir. With regards to certain specific things, no; but in general, yes.

Q. Are there protocols, guidelines, or requirements for the collection of evidence on behalf of the FBI in criminal cases?

A. In general, yes, sir.

Q. And what are they?

A. I will -- Again, it is going to depend on the particulars. That is why I was saying there were some cases where I wouldn't know. But, for example, if we are going to go to a search warrant, we would obtain a search warrant, we would go to the site where we are going to execute the search warrant, we would inform the individuals there, and we would either have an evidence collection team or somebody designated as the evidence collectors, and they would collect those things that the warrant authorized us to take.

Q. You say evidence collectors. Are they instructed or trained on the proper way to acquire electronically stored information?

A. They are familiar with them, yes, sir.

Q. Okay. So there are some guidelines or suggestions on how to do it properly?

A. Again, sir, in general, there are some specific instances. For example, if the information is across a network and it is not stored locally, there becomes some different questions on whether there are guidelines or procedures are not, so I don't want to give you a blanket yes. But for the most common types of electronic storage evidence, yes.

Q. Well, let's take, for example--and it may apply to this case, then, factually--if you have a search warrant that the Judge has issued for a business office --

A. Yes, sir.

Q. All right. And so this business office is populated by, let's say, 10 or 15 employees or supervisors and employees, and they have workstations, and each workstation has some computer terminals or -- What do you call them? Desktops. And also the peripheral equipment I guess that goes with that, and a server maybe stationed in some storage room or something like that.

A. If it is all on-site, yes, sir.

Q. Well, of course, if it is connected by the internet through some off-site server, that might be also a place of interest?
A. Yes, sir. But, again, there is different procedures for that, and not everybody will have been trained on that. In addition, there is some questions on if it is a Rule 21 search warrant, do we have permission to go to the other place. There is a lot of things that have to get worked out if it was not covered physically in that space. That is why I am trying to not say an absolute answer on one thing, sir.
Q. And in preparation for the execution of this search warrant, quite often, or almost all the time, I guess, is some chart or diagram drawn of the floorplan of the premises that you are going to search so that you can identify individual computers belonging to individual offices and that sort of thing?
A. It wouldn't be prior to. It would be concurrent with the execution of the search warrant.
Q. Okay. If you had prior information, though--somebody told you, "I am a member of that staff, and here is where Joe and Ralph and Frank all office"--do sometimes you draw diagram so you will know before going into the premises --
A. We might, sir. But generally we actually would do it when we get there, because often people's information they give us is not accurate with what we actually find.

Q. And the purpose of drawing the diagram of the location of these different computers is so that you can establish a chain of custody. Is that true?

A. No. The chain of custody is established by taking it, but the purpose is to identify where they came from; physically be able to put back that that device came out of Room, A, B, C, or D.

Q. And when you enter on a business premises, are labels attached to the computer devices so that they can be identified?

A. It might be on the packaging around the device. The device -- It might not be on the device itself. It depends on the size of the device, the kind of device it is. But labels are attached. It may not be directly to the devise. It may be the packaging.

Q. And then photographs are taken of each individual device and the peripheral equipment around it. Isn't that true?

A. You may have more than one device in a picture, so I don't want to say each individual devise, but pictures are taken of everything they that we take, yes, sir.

Q. And the purpose of that is so that there is no question that this computer was sitting in front of the court reporter, or in the court reporter's workstation, for example. Is that right?

A. To try and eliminate the questions of that, yes, sir. I

won't say there is never any question, but to try to eliminate those questions.

Q. And the purpose is to build and preserve the identity of the machine, there is the labeling on it, and location of it, and that sort of thing?

A. In general, yes, sir.

Q. And then, tell the Judge, after a survey is done and it is memorialized, either with a diagram and/or maybe photographs, what do the evidence seizure personnel do next?

A. Generally leave a receipt with a representative who is there, or if there is nobody there, leave a receipt at the building, and transport it to our evidence storage facility.

Q. Agent Lynd, it is important as to what information is contained on the instruments or the machines, computers, that you are looking for, isn't it?

A. I am sorry. Say that again. I didn't catch it.

Q. It is important to seize and secure the information that is on each individual computer. Isn't that true?

A. Well, the taking of the information is different than the taking of the devices, so, I mean, we are talking two different procedures there, so I am not sure what you are --

Q. Please help me understand.

A. Once you have a -- You could be doing it one of two ways. If, for example, the business is one that we have been directed to allow the business to continue operating and all

we are doing is taking the information and not taking the physical device, then we would have somebody like one of our CFL members, or a specially trained technician who is authorized to make digital copies of the device, go in, make a digital copy, either while it was running or turn it off and make a copy of it, called an image, generally, and then we would take that image. We would never touch the actual device. So when you are saying the data, we may not take the device. We may just take the data from the device.

Q. And in some cases the device is actually taken, and other cases just the data is downloaded and taken. Is that right?

A. I would say copied. I wouldn't necessarily say downloaded. There is two different connotations there, but yes, sir.

Q. Okay. I will apologize ahead of time. I am not that familiar with the nuances of all these computer terms.

A. Yes, sir.

Q. So if I use a word or a phrase or some concept that isn't accurate, just say so and we will work through it. Okay?

A. Yes, sir.

Q. Is it important, when you enter the premises, to make sure that the personnel, the civilians that are there, not touch the computers or, I will say, monkey with the computers, when you are trying to secure the premises and get the information?

A. When we get into a place like that, generally we don't let people in, so I am not sure. I mean, we are doing that more for our safety of the agents. And we don't want them to touch those, but the people are really being kept out of the way because we don't want there to be any misunderstandings between individuals. We don't want anybody to think they might be going for a weapon or something like that or doing something like that. I mean, we do also do it because we don't want them potentially changing evidence, but it is more for the safety of everybody.

Q. Okay. But there is some concern about if you enter a business premises, announce that you have a search warrant, there would be some concern about somebody in the back office there hitting delete. That is the only phrase I know. Altering the evidence. Is that true?

MR. GREEN: Your Honor, at this time I have to object. Mr. Ethington is asking Agent Lynd all about search warrants. There was no search warrant in this case.

MR. ETHINGTON: There was.

THE COURT: Well, the concern I am having, though, Mr. Ethington, is what you are asking about doesn't appear to have anything to do with the issues you have raised in your motion to suppress. You don't mention a search warrant in the motion to suppress, you don't challenge the validity of any of that, so I am not sure where you are going with all this.

And you need to do it quicker. If there is some method to it -- You spent almost ten minutes on this preliminary stuff, and we haven't got anywhere yet.

MR. ETHINGTON: Judge, I just wanted to establish as quickly as I could, and I don't have all the expertise --

THE COURT: Well, this isn't a discovery hearing, counsel, and we just need to get to the issues you have raised in your motion to suppress and let's get to that.

MR. ETHINGTON: Judge, the issue in the motion to suppress, as the Court well knows, is that there was a tainting of that evidence because these procedures --

THE COURT: An alleged tainting of evidence, yes.

MR. ETHINGTON: That these procedures that are the common practice of the FBI to preserve evidence were not followed in this case, and that is my point I am trying to establish.

MR. GREEN: If I may, Your Honor, the FBI didn't collect the original evidence in this case, so the FBI procedures are irrelevant to this.

THE COURT: My understanding of the pleadings that have been filed, there is no allegation that the Government was involved. You have identified some private entities that were involved in doing the imaging, the forensic examination, and perhaps the tainting. I know there are some allegations of tainting. But you have not identified anything that the

Government did or didn't do.

MR. ETHINGTON: No, Your Honor.

THE COURT: So why is this relevant, then?

MR. ETHINGTON: So that the groundwork is laid to show what the proper way to do something is.

THE COURT: That is the FBI, that is the way they do it. I want to know what the other persons did. I will let you go another two or three minutes. You are just taking too long to get where you are going.

Q. (BY MR. ETHINGTON) Is it FBI procedure that the evidence to ensure that it is not tainted be preserved and there are certain strict procedures that you go through in acquiring electronic evidence?

A. There is guidelines. I won't say procedures, because each time you may find different things, like the Macintosh may be different than a Windows machines, so there are guidelines.

Q. Is there a guideline -- Do you know if those guidelines in the acquisition of evidence in a criminal case are different than the acquisition of evidence by the private sector in civil cases?

A. I don't know what people do in civil cases. I am only familiar with what the FBI does on the acquisition of evidence.

Q. But you are familiar with the procedures that were done

in this case that you are the case agent.
A. I am familiar with what I was told by Mr. Gorgal and Mr. Cowen they did, yes.
Q. Okay. Is it important to preserve the evidence in a forensically clean, I guess, mirror image of the contents of a hard drive on a computer --
A. Yes.
Q. -- for investigative purposes?
A. Yes.
Q. Okay. Do you know -- Let's direct our attention to Exel Communications, that company. That is a company that is part of this case. Do you know how the evidence that you have acquired from Exel, how that was originally acquired by private personnel?
A. Again, I am just repeating what I was told. I wasn't physically there. But what I was told occurred was that Mr. Gorgal, for the most part, and I think Mr. Loper on four of the computers, Mr. Gorgal showed up on scene first in Dallas where he used a combination of various forensically authenticated tools--Paraben, SMART, and EnCase--to make images. He then proceeded to Memphis where he did most of -- in fact, all except for four, again, images, did the same thing for those, and then Mr. Loper did four of those, and I can't remember which tool Mr. Loper used.
Q. And then was that evidence ultimately turned over to you?

A. Yes, sir.
Q. Do you know where it was before -- or how it was stored and who handled it before it was turned over to you?
A. They reported to me that it was inside their evidence room at their office. The first time I physically had possession of it, they brought it to the RCFL and turned it over to me at our RFCL.
Q. And for the record, that R --
A. Regional computer forensic laboratory.
Q. The RCFL acronym, I guess, that you are using, that is the FBI lab, computer lab here in this area?
A. The FBI participates in the lab. It is an independent lab. But the regional computer forensic lab includes a lot of law enforcement, and so on, also. That is not FBI. So it is not an FBI lab. We are participants in it, but it is not our lab.
Q. All right. Did you determine from the acquisition of the evidence, or receiving it from wherever you got it, that a law firm had accessed these computers that were of interest to you way early on in preparation or investigation of a civil case?
A. No, sir.
Q. You know from your investigation that Strasburger & Price, a law firm here in Dallas, and Fish Richardson, they had examined the electronic evidence prior to you getting it?
A. Not the way you phrased it, sir. When you take the

original image, that becomes your best evidence. Then you make working copies of those and look at the working copies. And what I have been told is they examined the working copies of those; not the actual ones that were turned over to us.

Q. So my question is, the electronic evidence that you have got in your case that relates to Exel --

A. Yes, sir.

Q. -- when was that mirror imaged?

A. In 2006, starting in February--I can't remember the exact date; mid February--and continuing on through April, I think the 4th-ish. It might have been the 5th; around that time period.

Q. And you told us that the law firms examined this evidence--that is accessed it and --

A. No, sir. That is what I am saying. Once these images are made, they were not examined again. These images were then copied in turn, same as we provided you a copy of them for your discovery. The originals were not looked at. The copies of the originals were looked at.

Q. Okay. Now, directing your attention to before the images were made in February of 2006, I guess.

A. Around there, yes, sir.

Q. Okay. Did you determine that two law firms, at least, had examined this electronic information prior to the imaging of it that you had the benefit of so that they could determine

if it would be justified to image it, you see?

A. I am not aware that that occurred, sir.

Q. Have you inquired about that? What I am getting at is this. You have got mirror images of computer contents.

A. Yes, sir.

Q. And before those mirror images were made, was it of concern to you what had been done with that electronic evidence beforehand; before it was imaged?

A. I am not sure I am tracking, but let me see if I am understanding what you are saying. You are asking me if I am concerned about what happened with those computers before copies were made by the firm that provided them to us?

Q. Yes.

A. Okay. Sir, whatever was done with those computers before that, what would have been done by the internal employees at Exel I would not be concerned with, because they explained what they did in terms of doing that. They told us effectively--and I am summarizing--that they had had somebody come in and look at the PBX system to see if there had been some phone tampering. They were unable to determine if there was. They didn't think there was. So they hired another expert firm, which was G-C Partners, and then G-C Partners started looking at it.

They didn't tell us anything about any kind of -- the law firms reviewing it in between then. The first that we know

about it is in between those two times that the computers continued on doing their normal business, and then G-C Partners were the first ones to examine that.

Q. Okay. Agent Lynd, from your examination of the early history, I will call it, of this electronic evidence, did you -- In either interviewing people or reviewing emails or other correspondence, did you determine that at first there was internal searching or analysis of this electronic data by company employees of Exel; and then after that a review or examination by a law firm of not the mirror images but the raw data; and then after the law firm reviewed it, it was decided to hire the outside consultants to come in and mirror image it? Did you determine that in your investigation?

MR. GREEN: Objection, Your Honor. I can't even follow that question. It was a compound question. I ask counsel if he could break it down into smaller chunks so the witness can understand it.

THE COURT: Did you understand the question, Agent.

THE WITNESS: I am not sure, sir, but I will do my best to attempt to answer it.

THE COURT: All right. Go ahead.

THE WITNESS: That is not what I have been told or what is suggested to me about what is on there. Yes, internal company employees did look to see if they could find what was going on with their company, but they are not looking, from

what I can tell, at the same portions of the computer that were eventually examined by G-C Partners. In particular, the Outlook Web Access logs, which are part of the IIS logs, do not appear to have been examined prior to G-C Partners showing up.

MR. ETHINGTON: Good. I think that answers it, Judge.

THE COURT: Okay.

Q. (BY MR. ETHINGTON) Then let's turn our attention to another company that was also involved in the civil suit and would be part of the investigation of the criminal case that we are here today on, and that is another company called TTS.

A. Yes, sir.

Q. Did you receive electronically stored information from representatives of TTS?

A. I received two different things from that. And when you say from TTS, I need to clarify because some I got from representatives of the Court and not representatives of TTS.

There was a TRO which constituted imaging of the computers at TTS, and that was directed by the Court and Andy Rosen from the firm ASR Data did that. And I actually got those from Andy Rosen. Thompson & Knight, who represented TTS at the time, also had a separate outside forensic firm, Alvarez and Marsal, do some review of the digital evidence, and I received from them some of their review and eventually,

actually fairly shortly ago, some original back-up tapes, which nobody had known had been preserved by this forensic firm until a few months ago.

Q. Did you determine that this electronic evidence at TTS had been reviewed, accessed, reviewed, by associates and partners of Thompson & Knight in conjunction with employees of TTS?

MR. GREEN: Objection, Your Honor. Mr. Ethington's motion goes to tainting by G-C Partners; not by ASR data. Now we are in a different totally area that is not even anticipated by his motion, and I would object to this line of questioning.

THE COURT: Mr. Ethington?

MR. ETHINGTON: I am sorry, Your Honor?

THE COURT: His objection, response to that?

MR. ETHINGTON: This is all part of one big picture, Your Honor. May I ask that the elmo be turned on?

THE COURT: Sure.

MR. ETHINGTON: May I approach the witness?

THE COURT: Yes.

MS. GROVES: May I see it?

Q. (BY MR. ETHINGTON) Agent Lynd, I have handed you a diagram, and you will see different entities depicted there. And I will ask you, is Exel up in the left hand corner, is that the entity -- Does that represent the entity that we

talked about earlier, that company?

A. I didn't draw this so I am not sure, but I assume so.

Q. And on the right side, TTS, that is the other entity we have talked about?

A. That is the other entity that was in the civil suit, yes, sir.

Q. And then you are familiar with the controversy surrounding a separate lawsuit that is Securities and Exchange Commission versus Randall?

A. I am familiar with the allegations made by the Receiver. I am not actually familiar with the case in chief in that, but I am familiar with the allegations, yes.

Q. Yeah. You have reviewed some of that. In fact, it has been the subject of some hearings here in this courthouse, hasn't it?

A. What do you mean by "reviewed it"?

Q. Reviewed certain documents regarding --

A. Documents, yes; electronic evidence, no.

Q. No, but filings and that sort of thing, to familiarize yourself with the controversy surrounding this SEC versus Randall case.

A. Again, sir, I am not familiar with the case in chief. I am familiar with the allegations related to tampering. I am not familiar with the case in chief.

Q. There is actually two -- There is a criminal

investigation regarding Mr. Gorgal and Mr. Cowen's company called G-C Partners. That is separate -- has been removed from this district. Correct?

A. Yes, sir.

Q. Okay. And then also you are familiar with G-C Partners having been contracted at one time to provide electronic data services in the Musacchio case, and this G-C Partners was contracted with the U.S. Attorney's Office.

A. I believe so, sir.

Q. Okay.

MR. ETHINGTON: We would offer for demonstrative purposes, Your Honor, Exhibit No. 16 for hearing, Hearing Exhibit No. 16.

MR. GREEN: Objection, Your Honor. It is my understanding that this is not an accurate representation of what it purports to be. If I could just voir dire the witness for one second on this exhibit?

THE COURT: Put that on the elmo so I can see what you are referring to.

And you may voir dire the witness.

Q. (BY MR. GREEN) Agent Lynd, you have Defendant Exhibit No. 16 in front of you, sir?

A. I do, sir.

Q. Is there any -- Based on your investigation and everything you know about this case, is G-C Partners in any

way connected to the collection of evidence of Total Transportation Systems?

A. No, sir.

Q. So the arrow that is connecting TTS to G-C Partners, would that be accurate?

A. No, sir.

MR. GREEN: Thank you, Your Honor. I object to the exhibit.

THE COURT: Mr. Ethington?

MR. ETHINGTON: I have a document, Your Honor, that I would like to show that establishes that connection.

THE COURT: Do you want to ask the witness about it? Do you want to question the witness?

MR. ETHINGTON: I am going to have to find that document, Your Honor. I have more documents, but this is an index of the production that was given to us in the course of this case, and it is TTS documents received. It is page -- it is 73. And it is a chronology of the events occurred regarding TTS, and it shows that Exel conducted post-audit computer system examinations, and it was performed by G-C Partners at TTS. That is the line that we are talking about here. I mean, I just didn't draw that line. I have a document to support it, if I can find it, to present to the Court.

MS. GROVES: Jay, could I see your document?

MR. ETHINGTON: May I approach the witness, Your Honor?

THE COURT: Hold on a second.

MR. ETHINGTON: May I inquire of this witness?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) Are you familiar in the civil settlement of the dispute that really gives rise to this criminal case that one of the items in the settlement was that Exel would be allowed access, full access, to TTS's computers so that they could remediate, that is, determine whether or not there was any additional evidence on the TTS computers, and that G-C Partners spent two months examining TTS's computers? Are you familiar with that?

A. I am not familiar with that happening at the time of this collection. I am familiar with that happening five, six months after the collection already occurred and the images had been made.

Q. Yes.

A. Yes, sir.

Q. But G-C Partners was on-site at TTS with full run of their computer records and system --

A. Not during the collection.

Q. It shows the dates there.

A. That is not the collection of the evidence, sir.

Q. I am not talking to you about collection. I am talking

about mere G-C Partners access to TTS computers back in 2007. That happened, didn't it?

MR. GREEN: Objection, Your Honor. What counsel is trying to establish is that G-C Partners went to an audit of TTS after the data collection, which the evidence in this case was collected from TTS. It is not relevant. We are not relying on anything that happened after the data collection at TTS.

MR. ETHINGTON: The original objection was that this misrepresents -- there is no connection between G-C and TTS, and the witness has just established --

THE COURT: He is also saying it is not relevant because they are not relying on any evidence from this time frame as far as what they are relying on in their case.

MR. ETHINGTON: Judge, we will find in development of evidence further that there was a continuing production of records, a continuing --

THE COURT: Production from?

MR. ETHINGTON: From TTS or Exel with law firms and then the Government. And from the discovery that we have gotten, and it may be there, but it has been voluminous discovery, I don't know when the Government got the TTS servers, for instance. It is probably buried somewhere in the discovery that has been given to me. But if it is after October or November of 2007, then the issue comes as to

whether or not Gorgal and Cowen tainted that evidence, before production, that they are using in this case. That is what I am trying to do is establish this relationship.

Also this chart I think demonstrates that G-C Partners was in the center of all of the entities that are involved in the criminal case, and they also have these federal allegations of corruption of evidence. That is why that Randall entry is on there.

THE COURT: All right. Go ahead and pursue your questioning.

MR. ETHINGTON: Well, we would offer Exhibit No. 16 so that we can talk about it in the record.

THE COURT: The objection that you have previously made?

MR. GREEN: Same objection, Your Honor.

THE COURT: And those objections are overruled. This is Defendant's Exhibit No. 16, which is admitted.

Q. (BY MR. ETHINGTON) Looking at this exhibit now, does it accurately depict, from your knowledge, the relationship between G-C Partners, Exel, TTS, the Randall case that we won't belabor the Court with, and the U.S. Attorney's Office?

A. I, frankly, am confused by the way you are asking it, but I don't know how to answer that with the exception of TTS did an audit, yes, in October/November of 2007. It was not related to the collection of the evidence which occurred in

April and May of 2007 which are on Mr. Rosen and the Alvarez and Marsal reports on the collection of that evidence.

The U.S. Attorney's Office did briefly hire G-C Partners in a few-month period, which I think the dates are accurate. I don't know the dates off the top of my head. And then when the allegations were brought, they terminated the contract.

Q. What was the reason for the U.S. Attorney's Office hiring G-C Partners?

A. Basically so that they would be -- could provide some expertise as to what they had done in this case.

Q. It shows here August of 2009 to January of 2010. Could you tell us whether that would be an accurate time frame?

A. It seems about right. I don't have the dates in front of me.

Q. Are you familiar with the U.S. Attorney's Office --

MR. ETHINGTON: I am just trying to pin this down a little bit quickly, Your Honor.

Q. (BY MR. ETHINGTON) -- the U.S. Attorney's Office seeking an employment contract for consultant form from the state DA's office that was used for the -- TO memorialize the relationship. Are you familiar with that?

A. I am not familiar with how the relationship went. I am familiar that there was a brief period where they were contracted. I am not familiar with the negotiations or anything like that going on.

Q. Was there a written contract, if you know?
A. I don't know. There might well have been. I just don't know. I know there was some kind of business arrangement. I don't know what it was.
Q. G-C Partners presented to you, I understand, some, what I will call, chain of custody documents. Is that right?
A. Yes, sir.
Q. Okay. And then those chain of custody documents were produced to the Defense in the normal course of discovery. Is that right?
A. Yes, sir. And supplemented as we got additional from them.
Q. Those chain of custody documents regarding -- from G-C Partners, were they given to you first and then you gave to the U.S. Attorney's Office, or do you know?
A. I am not sure if they came straight to me or if they came to the U.S. Attorney's Office on the first instance. On the second instance, they were emailed to me and I provided them to Ms. Groves. The first ones may have either physically gone to the U.S. Attorney's Office first or me first. I just don't remember.
MR. ETHINGTON: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. (BY MR. ETHINGTON) Agent Lynd, I will show you the chain

of custody documents that appear to be presented to us via that transmittal letter from G-C Partners. Do you see those?
A. Actually I see more than just that here, sir.
Q. Yeah. There is quite a bit more than that. But could you remove from what you are looking at there the transmittal letter, I guess you would call it, and the G-C Partners chain of custody forms? Do you got it?
A. Yes, sir.
Q. And I think we all know, but for the record, chain of custody on electronically stored information is just as important as any other evidence in a criminal case, isn't it? The chain of custody?
A. Yes, sir.
Q. And so can you quickly count the number of pages that were produced regarding --
A. Well, in this supplemental one there appears to be one, two, three, four, five, six, seven, eight, nine. But this is the second of two sets of chains of custodies. There were other ones produced before this.
Q. Produced by the Government to the Defense?
A. Yes, sir.
Q. And how were they produced?
A. I don't know if you got them via email or you got them via letter. I don't know how it gets transmitted to the U.S. Attorney's Office to you, sir.

Q. So the Judge knows, the date of that letter is August 8th of 2012?
A. Yes, sir. This is about three or four days after we got them.
Q. And there were additional --
A. This is the additional, sir.
Q. Okay. And there were previous --
A. Yes, sir.
Q. -- chain of custody documents --
A. Yes, sir.
Q. -- on G-C Partners?
A. Yes, sir.
Q. How were those presented? How were those sent to us?
A. Again, sir, I am not at the U.S. Attorney's Office when they get turned over. I don't know.
Q. Did you receive a couple of days ago a response to the subpoena that I had presented?
A. Ms. Groves did, yes, sir.
Q. Okay. A copy of a subpoena that I issued to G-C Partners for production of chain of custody documents?
A. Yes, sir.
Q. And did that production include substantially more documents than what you are holding there?
A. Actually, sir, it produced almost all the same documents we had given to you previously, either our two chains of

custody we have actually given to you that they didn't produce in that production for you, and they produced for you some invoices they never produced for us.

Q. I guess it is your testimony, then, that G-C Partners produced chain of custody documents in two batches to the U.S. Attorney's Office?

A. Yes, sir.

Q. Why was there two batches? Do you know?

A. I do know, sir.

Q. I am sorry?

A. I do know, yes, sir.

Q. Then why?

A. Because I noticed some were missing and called them up and said, "It doesn't appear you have all the chains of custody here. We need the rest of them."

Q. And they followed up on that?

A. Yes, sir.

Q. And then they produced -- They didn't produce two additional ones?

A. There are two chains of custody forms that we produced for you that we got from them. They should be labeled -- I can't remember the start of them, but the last three digits are ECD Echo, Charlie, Delta. So they probably start the same SB-1 dash something, ECD 1 and ECD 2. Those are not, or at least I do not see them in that document, but they had

previously been provided to you when we turned over the first batch of discovery documents, or first batch of chain of custody in discovery.

Q. Have you had a chance to review those chain of custody documents that were produced to me a few days ago in answer to the subpoena I issued?

A. I actually reviewed these when we got them from them, yes, sir. I didn't review them when -- I reviewed them when we got them from Mr. Gorgal. When we got these I reviewed them; not the set that you got from Mr. Cowen or Mr. Gorgal. I am not sure --

Q. Can you characterize for the Judge, so we can move along quickly, that the production of documents that were given to me in answer to the subpoena are readable and legible, and the ones that they gave to you have blanks in it and missing information and illegible?

A. I would characterize their handwriting as poor, sir, but I won't say it is illegible, but I don't know what you mean by blanks.

MR. ETHINGTON: May I approach?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) Chain of custody has to do with receiving information, possessing it, and then passing it on to someone else. Right?

A. Yes, sir.

Q. Do you see this blank here -- This form?
A. Yes, sir.
Q. It says "received from" and it is blank.
A. That is correct, sir.
Q. And it says on the next one "received from" and it is blank.
A. Yes, sir.
Q. And it says "manufacture, model, and serial number" and those are blank.
A. Yes, sir.
Q. Can you tell me what that action, that little scribbling there underneath that, is?
A. It looks like initials of a person, but I can't tell for sure.
Q. Isn't it important in chain of custody documents to be legible to where somebody reading them can understand where the evidence started from and where it went through and then where it ends up? Isn't that important?
A. For us it is, sir. I am not going to vouch for their quality of their work, sir, on the chain of custody documents themselves.

THE COURT: Mr. Ethington, how much longer do you expect your examination of Agent Lynd?

MR. ETHINGTON: Another half hour, Judge.

THE COURT: I am going to keep you to it. No more

than a half hour.

MR. ETHINGTON: May I make this an exhibit, Your Honor? Do you have a copy of this?

MS. GROVES: Which one?

MR. ETHINGTON: I am not sure. It is the illegible ones, I will call it.

MS. GROVES: Is it this one?

MR. ETHINGTON: Yes.

MR. ETHINGTON: The ones that we sent out to you on August the 8th, or what you subpoenaed?

MR. ETHINGTON: August 8th.

We would mark that as Exhibit No. 17, Your Honor.

MR. GREEN: No objection.

THE COURT: Admitted.

MR. ETHINGTON: May I use the elmo on this?

Q. (BY MR. ETHINGTON) You see that form? That is what we have been talking about, isn't it?

A. Yes, sir.

Q. Would you say, in the FBI's estimation, that that is an inadequate accounting of the chain of custody for whatever item that is that they are talking about or writing about?

MR. GREEN: Objection, Your Honor. I don't know the FBI standards or what applies to the industry. I object to the question.

MR. ETHINGTON: I will rephrase it.

Q. (BY MR. ETHINGTON) Does that give you enough information to be able to account for the chain of custody on these exhibits or this evidence?
A. It would depend on the context, sir. If this is 1, for example, of 20 and they all came from the same person and there was a cover sheet from that person on the received, it might. In and of itself, it does not.
Q. Going to the next one, would you say that in and of itself is inadequate in the chain of custody accounting?
A. Again, without any other documents surrounding it, I could not tell where they got it from. That would be correct, sir.
Q. And is that fairly the representation of the rest of this stack? They are just blanks and somewhat illegible?
A. It is representative. They all look about the same, sir.
Q. Do you have a piece -- This is now Exhibit No. 17, so I want to be sure and keep it in order. Do you have any in front of you, there, any part of it?
A. Alvarez and Marsal only, sir; not G-C Partners.
Q. Can you tell the Judge whether there was any controversy surrounding the chain of custody of these electronically stored information items as you accumulated them in conjunction with the criminal case?
A. Just that all the forms weren't there when they initially provided them to me, sir.

Q. In the accumulation of the hard drives at Exel, was there one of the computers, for instance, that had had the hard drive removed?

A. You are talking about two different things at this point, sir. That was not looked at by G-C Partners, nor was it provided to me. But there was -- As I understand it, there was a question about one of the computers, and I can't remember whether it was Mr. Brown's or Mr. Kelly's, off the top of my head, but there was a question about one of the laptops where they went to go look at it, and it had been stored in Mr. Merrill's office, I believe, and when they went to go look at it there was no hard drive in it.

Q. Was that an indication to you, as you were gathering evidence, that there had been spoliation or even removal or destruction of evidence?

A. By Mr. Brown or Mr. Kelly possibly; by Exel, no.

Q. I am not accusing Exel of anything. I am just saying that in your accumulation of evidence on the Exel aspect of this case, as it relates to the Musacchio case now, there was examples of people either hiding evidence or destroying evidence. Isn't that true?

A. On the TTS computers, yes; on the Exel computers, no.

Q. Was the missing hard drive, I will call it on I think it was a laptop, was that the laptop that Kelly or Brown used at Exel, or Kelly or Brown used --

A. At Exel. But again, sir, you asked if that was evidence of spoliation, and my answer would be no. In interviewing Mr. Richardson about it, he said that drives were often repurchased -- Repurposed. Sorry. I didn't mean repurchased. Repurposed. And he didn't consider that to have been necessarily a particularly malicious act; that that drive may have been done just because they needed that drive in another computer. We have also since talked to Mr. Kelly, and he has confirmed that he thinks that it was just repurposed.

Q. So Mr. Kelly is a Defendant in this case.

A. He has pled guilty, yes, sir.

Q. He is a Defendant in this case. Correct?

A. Yes, sir.

Q. And that was his laptop we are talking about. Correct?

A. Again, I don't remember if it was Brown or Kelly's. It was one of the two of them, yes, sir.

Q. You said Kelly told you that it was repurposed.

A. Yes, sir. But I don't remember if he said it was his or Brown's. He just said they repurposed the drives all the time.

Q. So it was important in your criminal investigation to get information from a computer that was used by one of the Defendants, wasn't it?

A. Sir, I am not sure what you are asking, because in this particular case when we came to this case none of the original

evidence, as far as we knew until a few months ago when we found these back-up tapes, none of the original evidence still existed at that point. It had all been used for too long to ever be of use for us going forward. We had to rely on, and did rely on, the images and the collection made by the other companies at the times concurrent with the incidents occurring. So we didn't go back to any of the places and look for additional computers unless those computers had not been used or touched, or cell phones or whatever, since the time of the incidents.

Q. That is what I am getting at. From the time of the alleged incidents in the indictment until the time the FBI was starting to acquire evidence was a couple of years, wasn't it, or more?

A. I think it was two, sir. Again, I would have to go back and look at the timeline. I think it was two years. I would have to go back and look at the timeline, though.

Q. And during that two-year period, this evidence that the FBI is interested in, it had been used by other people, I guess repurposed or --

A. No, sir, it had not. You are confusing the issues. The evidence that we are looking at, that we looked at, were the collections made at the time of the incidents. So collections were made in 2006. Those collections were left pristine. The computers that were being used that those collections were

made from may have been continued to be in use, but those collections were not used after that. Even for the purposes of the civil case, they didn't use the collections themselves. They used copies of those collections in order to continue doing their analysis.

Q. And the collections I guess made by Alvarez and Marsal, or G-C Partners if it is Exel or TTS, those collections occurred a year or so after the events --

A. No, sir. Those collections occurred starting in February 2006 through April 2006 for G-C Partners. Those collections occurred for Andy Rosen from the court-ordered TRO in April 2006. The collections occurred for Alvarez and Marsal in May of 2006. So the collection period would have included from approximately mid February--it may have been early February or late February--from approximately mid February through April 4th or 5th, somewhere in there, 2006, as far as -- Sorry. May, not April. May 2006 for Alvarez and Marsal.

Q. You mentioned Andy Rosen. Andy Rosen mirror imaged, I guess, the TTS computers on behalf of Exel. Is that correct?

A. On behalf of the Court, sir.

Q. On behalf of the Court. Well, the Court asked for suggestions as to who the Court ordered expert would be, didn't they?

A. They did, sir.

Q. And they asked that from the Plaintiff?

A. Actually I think they asked it from Matt Yarbrough, who was the lawyer for the Plaintiff.
Q. Uh-huh. And he recommended Rosen.
A. I believe so, yes, sir.
Q. And the Court adopted that recommendation.
A. Yes, sir.
Q. Do you know that that recommendation came from G-C Partners?
A. I do not. I know it came from the attorney. It wouldn't surprise me to learn it had come from them.
Q. You know that there is a relationship, a working relationship and a professional relationship, between G-C Partners and ARS, Andy Rosen?
A. ASR, sir.
Q. ASR.
A. I know there is a relationship, yes, sir.
Q. A referral relationship. You have seen evidence of that.
A. That, and I know they also co-authored a book at some point.
Q. Right. So G-C Partners -- Would it be your testimony, just in your own observations, that G-C Partners had recommended Andy Rosen to do this preservation of evidence for the Court?
A. It wouldn't surprise me were they the ones who suggested it to Yarbrough, but all I know is that Yarbrough is the one

who suggested it.

Q. Okay.

MR. ETHINGTON: Judge, I know the Court had conducted a hearing yesterday of some consequence, and I don't know how long it was, regarding this Randall matter. I am going to assume the Court knows something about that because of the hearing yesterday. May I go into briefly, though, the allegations in the Randall matter having to do with G-C Partners?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) You are familiar with the allegations made by the Receiver against G-C Partners in the Randall matter, are you not?

A. I am familiar with the allegations against Dave Cowen and Kal Loper of G-C Partners, yes.

Q. And those allegations are spoliation of evidence, destruction of evidence, or modification of evidence. Is that right?

A. The allegation is that modification of evidence occurred intentionally.

Q. Yes. And that is under investigation presently by I guess the FBI and the U.S. Attorney's Office in the Eastern District.

A. That is correct, sir.

Q. And do you have and idea, for the Court's benefit, as to

what the status of that case is and where it is going or how long it will be?

A. I do not, sir.

Q. And did you at one time, though, participate in that investigation?

A. I was the one who opened the investigation up based on the Receiver's allegations.

Q. And how long did you work on that case before you, I guess, were recused?

A. We self-recused, sir, and it was --

Q. I am not saying it in a bad way.

A. It was -- I think we opened it in February/March time frame of 2010, and I think we self-recused in 2011, but I am not positive. It might have been early 2012.

Q. And there was some -- I saw in your reports some reasonable suspicion on your part that the offense had occurred. Is that right?

A. There was enough to open an investigation, sir.

Q. There was communication that was part of the discovery between you and the Prosecutor, Ms. Groves, about whether it should be probable cause, reasonable suspicion. Do you remember that email?

A. I don't. I remember there was enough to open an investigation, though.

MR. ETHINGTON: May I have just a moment, Your

Honor?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) What is the standard to open an investigation; actually formally start putting time in on it?

A. It varies, but in this case it would have been enough to have a reasonable belief.

Q. Reasonable belief. That is the phrase. But then, for this record purposes, you don't have any further knowledge as to what the status of it is or where it is going?

A. Not as of turning it over to the Eastern District, no, sir.

Q. Would it be important, though, to your work in the Musacchio case to know whether or not G-C Partners, who appears to be in the center of this, is guilty of a crime or convicted of a crime having to do with electronically stored evidence and the manipulation of it?

A. In theory it could be. I won't say it would or not, but it could be. In this particular case, I would say the answer is no, because we have enough corroborating evidence from elsewhere that shows that the chances of some kind of tampering or spoliation in this particular instance are so vanishingly small as to be almost impossible. But in general, theoretically, it could impact that.

Q. You have told us, and I won't rehash this, but you have told us that G-C Partners, when you asked them for chain of

custody documents, which are critical, they were inadequate and you had to ask them twice, and then there is a batch of them that on their face --

A. Yes, sir. But that has nothing to do with whether the evidence is reliable or not. The evidence being reliable on a reliable image -- a log is generated as you do the copying, as you do the imaging. So, for example, if you used FTK to image, which is the tool we generally use in the Bureau, as it does the image, it generates a log that says it is making the copy properly. As it generates that log, it also gives you check sums and other things so that you know you have a good copy.

With the images that we received from G-C Partners, we did receive the logs that showed the copies being made. Those logs appear to be in tact, appear to be adequate, appear to show that those are indeed good copies.

So while the documentation behind the collection may not be up to the FBI standards, the documentation of the copying, the logs generated automatically by the system as it makes the copy, are forensically sound and indicate to me that those are good copies and forensically sound copies of the computers made at the time they were made.

Q. So your testimony is you are not going to rely on the chain of custody documents, or even the results or work of G-C Partners. You are just going to rely on these electronic logs

that reside inside these servers. Is that your testimony?

A. In terms of determining whether the evidence is reliable, yes; in terms of overall for the case, no.

Q. So it is your testimony, in determining whether the evidence is reliable you are not going to rely on G-C Partners, their documents, or their work product to determine whether the evidence in this case is reliable?

A. Okay. Again, sir, I think -- And maybe I am splitting a fine hair and I don't understand what you are saying. To the extent that the image is a good image and is a reliable image, no, because the documentation doesn't pertain to that. The log generated by the computer process as it goes pertains to that. Knowing it is a forensically sound tool pertains to that.

As far as did they follow proper procedures to collect it, or something like that, that would not matter as far as whether the tool did its job properly. So, I mean, to me they are two different topics, sir.

Q. The tool would have been used by somebody at G-C Partners.

A. According to Mr. Gorgal and the documentation he provided, it was Mr. Gorgal in all but four instances.

Q. And then the tool in the Musacchio case was a SMART disk, was it not?

A. Not in every instance, sir. I think I said before there

is Paraben, SMART, and EnCase were used. There is A collection of tools depending on the kind of computer it was.

Q. I think it is your testimony, and correct me if I am wrong, that you really don't need to worry about the work product of G-C Partners, but if the tool was good and it did its job in collecting the evidence off of a server, and there is no indication of any monkey business on the evidence on the server, then that would be adequate?

A. Again, sir, you are talking two different things.

Q. Okay.

A. What the tool is telling me is it made a reliable copy of the image on the day the image was made. Now, if somebody were to suggest that there were tampering, that would say that the tampering would have had to occur prior to the image being created. The tool can't look back in time. It is not an analysis tool. It is a copying tool. So the generation of that log is just showing me that that copy, that image, that process that made that copy, was properly done and properly processed at that date and time.

Q. Can you tell the Court whether or not there was tampering by G-C Partners -- Have you got any evidence, one way or another, to show there was tampering by G-C Partners in the collection of their evidence in the Exel case?

A. I do not have any indications that would show tampering by G-C Partners in the Exel case.

Q. And do you have any evidence to show that there wasn't any tampering?
A. Yes, sir.
Q. And that is the logs?
A. No, sir. That is the confirmation from outside sources, not on the G-C Partners images, not on the Exel images, that would indicate the reliability of that data. So, for example, the data in the Exel case or the Excel computers, would show a computer intrusion from an I.P. address on a certain date using an administrative level account. I can then go to, for example, whoever the service provider is for that log, say Comcast or Verizon or AT&T, and subpoena them and ask them who owned this I.P. address on this date and time. They can then provide me that information.

If that matches up -- So, for example, if it is Mr. Brown's home I.P. address from his home account, and then there is an email from Mr. Brown to some other person a minute after that saying, "Look what I just found in the computer," I now have that email that confirms it, I have the logs that show an intrusion occurred, I have the data from Bell South or AT&T that shows all of those things all pointing to the same point in time, which would confirm the reliability of the data on those computers.
Q. Mr. Brown and Mr. Kelly, they were what is called superusers of the computers or administrators, weren't they?

A. Administrators.

Q. Administrators? And that means you have got unfettered access to the computer system?

A. In general, yes. There might be some systems that you don't have access to, but in general the answer to that is yes.

Q. And the logs that you have described that you considered to be reliable, they are subject to manipulation, aren't they?

A. In theory, yes, sir. But the number of log entries in this particular case is so voluminous and so consistent with the other data, that for it to have been done would be, again, practically impossible.

Q. These I.P. addresses, are those transferable or are they permanent?

A. It is going to depend on the source. So, for example, if you have a dial-up modem in your house, it may change each time you go. If you have a Comcast cable modem to your house, it may stay the same. Basically you have to go back to the service provider and ask for the dates and times in order to get those.

MR. ETHINGTON: May I have just a moment, Your Honor?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) Can you briefly describe for us what the logs look like in the Randall matter?

A. Which logs? I mean, there is multiple different things. The Randall matter didn't have to do with the Outlook Web Access or IIS. It was a complete different instance. It wasn't talking about email. So I am not sure which logs you are referring to.

Q. I don't know which logs there are existing in the Randall matter. That is all sealed up from me. During the time that you participated in the investigation of the Randall matter did you look at the logs?

A. No, sir. I looked at production of portions of the logs done by the Receiver's forensic expert. I did not look at the raw logs.

Q. So could you testify today that there was indications of document manipulation or destruction in the Randall matter, from your own observations?

A. I cannot, sir. I can testify -- What I can testify in that matter is from the information provided to me--not from any of my own observations; only from the information provided to me--that there does appear to have been alterations to the computers. Whether those alterations were intentional or not intentional, I cannot testify to one way or another at all.

Q. From your investigation in the Exel matter and the TTS matter, there were alterations in those matters, too, before the FBI showed up, wasn't there?

A. Sir, again, that is not accurate. The FBI didn't show up

for any of these computers. Andy Rosen showed up to image the computers at TTS. The FBI did not show up to image those computers. From answering, though, for your question is, there is strong indication that prior to April 4th that there was emails and other files deleted from the computers prior to Mr. Rosen showing up.

THE COURT: April 4th of what year?

THE WITNESS: Sorry. 2006, sir.

THE COURT: 2006.

THE WITNESS: I am sorry. Yes, 2006.

Q. (BY MR. ETHINGTON) And strong indication that there were deletions or modifications in the machines for Exel and TTS --

A. No, sir. Just for TTS.

Q. Just for TTS.

A. Yes, sir. And when I say TTS, that also includes the home machines of some of the individuals who worked for TTS who brought their home computers in.

Q. And to clear up my confusion on some of this, when we are talking about the different computers for these different entities, I guess we are talking about a server, which is a big piece of equipment that would reside in an office maybe, and then desktops, and then maybe laptops, and then maybe home computers also.

A. And I believe there were also some cell phones, BlackBerrys, things like that, too.

Q. That would operate through the server?

A. In the case of total, they initially, until about January, operated not through the server because the mail was remote through Sprint, I believe, and then after January of 2006 through the time it occurred, the BlackBerry exchange was indeed at there, but there was some of them -- There was a time period when the mail was hosted not at those computers.

Q. How did the FBI --

MR. ETHINGTON: I am winding down, Your Honor.

Q. (BY MR. ETHINGTON) How did the FBI in the Exel/TTS accumulation of evidence, how did they acquire it? How did you acquire it?

A. We did subpoenas for the already existing images to the individuals who were in possession of them, and then we did search warrants to look through the contents of those once they were in our possession.

Q. Okay. So a subpoena. And that is to law firms or the companies or both?

A. I would actually have to go back and look, but I think it was to the law firms representing the companies. I am not 100 percent positive.

Q. I am not trying to pin you down on this. Let's focus on Exel to start with. You accumulated electronically stored data from the Exel aspect of this case, didn't you?

A. We subpoenaed I believe it was Mr. Anderson who was

representing Exel at the time. He had then talked to whoever may have had the records. So, for example, Fish & Richardson still retained some of the records. They provided us some of those records, like the depositions, things like that. And then he told G-C Partners, directed them to bring us the images they had. And then, again, G-C Partners showed up at our lab and brought them. I can't remember if I went to Fish & Richardson to pick it up or if they showed up at our office. I don't remember which way it was for that.

Q. How long had this electronically stored information been stored in boxes --

A. From whenever they collected it until we were provided it.

Q. That was about four years?

A. It would have been 2006 to 2008. Maybe --

Q. Okay. About two years?

A. Two to three; somewhere in there, yes, sir.

Q. There was some finding of evidence that appeared to be lost or misplaced or shelved somewhere?

A. That was Alvarez and Marsal. That wasn't G-C Partners.

Q. Okay. Was that regarding, then, TTS?

A. Yes, sir.

Q. So there was some of this evidence that we will be talking about here in the Court that just sat on a shelf somewhere for four years, didn't it, or more?

A. It would have been 2006 through this year, so that would have been almost six years.

Q. Okay. Now, without going through each of these items, like a hard drive with a serial number on it or a server with a serial number on it, because it all comes to you, I guess, from different directions. But I would like to ask you, you were aware that this electronically stored data evidence that you were trying to subpoena and request, that had been through many hands before it gets to you.

A. I wouldn't say many, sir. We got it -- In the case of, for example, Alvarez and Marsal, the same individual who collected it from Tom Riehl at TTS was a guy named John deCraen. He had it still in his evidence storage facility at Alvarez at Marsal, and that is where we got it turned over from.

In the case of Andy Rosen, he had it in his storage facility down in San Antonio and he turned it over to us.

In the case of G-C Partners, they had it in their storage facility, which had moved. They had actually moved offices during that time. And then they turned it over to us.

Q. And this Alvarez and Marsal, for instance, that is a very reputable outfit, as far as you know, isn't it?

A. I actually don't know anything about them.

Q. Actually a national or international company. Do you know that much?

A. I do, but I don't know anything about their reputation within the industry.

Q. Okay. They did their imaging after --

A. They did not do any imaging, sir.

Q. Oh, they did not do any imaging.

A. No, sir. They had mail extracts, which were done by Tom Riehl who is an employee at TTS, and provided to them, and they had the original back-up tapes. So the back-up tapes that were sitting there were not imaged. Those are the actual tapes from the date it happened. They were never imaged. They were taken out of the -- There is like, for lack of a better term, a bank, this computer bank of tapes. They were taken out of that bank, put into storage back in 2006, and hadn't been touched since.

Q. Well --

A. As far as I know.

Q. As far as you know. There was another company that we are all familiar with, I think, Deloitte & Touche. Deloitte & Touche is referenced in working with TTS in the accumulation of this electronic data.

A. I am not familiar with what they did, sir.

Q. You didn't -- That wasn't part of your investigation? Are you familiar with the Thompson & Knight report?

A. Yes, I am, sir.

Q. And it references Deloitte & Touche doing some of this

computer analysis?

A. That is the analysis, not the collection. I am sorry. When you are talking about collection, I am -- There is two separate things here, sir. Again, when you make these copies, that is one thing. That is not even looking through the copies. That is literally, like, going to a desk and photocopying a document, for lack of a better term. The person who reviews that document is not necessarily the same person who photocopies it. And, again, the people who are doing the analysis are not working off that original document. They are working off of photocopies.

Q. So Deloitte & Touche did analysis of the TTS --

A. They did something for Thompson & Knight. Thompson & Knight were kind of vague about it with us.

Q. They were kind of vague?

A. Yes, sir.

MR. ETHINGTON: May I approach, Your Honor?

THE COURT: Yes. And you need to wind it up. Five minutes. You have gone over the 30 minutes.

MR. ETHINGTON: Yes, Your Honor.

Q. (BY MR. ETHINGTON) Do you have a copy of the Deloitte & Touche investigation analysis of this evidence that we are going to have in court here?

A. I have a copy of the Thompson & Knight report, sir, yes, sir.

Q. You have a copy of it?

A. Yes.

MR. ETHINGTON: May I approach real quick?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) You have a copy of Exhibit No. 11, Hearing Exhibit No. 11, don't you?

A. Yes, sir.

Q. And in there somewhere, and I don't think I marked that copy, there is a reference to Deloitte & Touche doing some work on this electronic evidence. Right?

A. Again, I have to go through and look for it again, sir, but there is references to a lot of people looking through the evidence with them, including Alvarez -- Well, I don't think they actually mentioned Alvarez and Marsal by name here. They mentioned a whole bunch of lawyers and other people going through it, too.

Q. Okay. So a whole bunch of people and lawyers have gone through the evidence before it ever gets to you.

A. Again, sir, they didn't go through the evidence that got to me. They went through copies of the evidence, not the original evidence.

Q. That is what I am getting at. I am going to wind it up here. You don't know what happened to this evidence before it was imaged, and then later on four years later given to you. You don't know what happened with these law firms and these

consultants reviewing the evidence before it was determined to mirror image it, do you?

A. Sir, what I know is what the various forensic people reported to me, which is that they made copies at the time and places specified. When they made the copies, they then provided copies -- They made images. They provided copies of those images to the law firms so that those law firms could review the evidence. So you are right, I wasn't physically there, but I know what they have reported to me.

Q. Yes. And there was a review of this electronic evidence by law firms and company employees, both Exel and TTS, to determine whether or not they even ought to spend the money on Deloitte & Touche and Alvarez and Marsal and G-C Partners. Isn't that right?

A. I don't think the law firm decided whether or not to spend the money on G-C Partners. They had already decided to spend the money to look for that because the president of Exel was insistent upon spending the money.

MR. ETHINGTON: That is all we have, Your Honor. Thank you, Agent.

THE COURT: Mr. Green?

MR. GREEN: Thank you, Your Honor. May I approach the witness?

THE COURT: Yes.

CROSS EXAMINATION

By Mr. Green:

Q. Agent Lynd, if we could back up just for a minute so that we have a clearer picture of what happened before the FBI got involved, are you familiar with the events that occurred that led to data collection by forensic firms before the FBI was even involved in this?

A. I am, sir.

Q. And could you look at the exhibit book at Exhibit No. 219?

THE COURT: Is this Government Exhibit No. 219?

MR. GREEN: Government Exhibit No. 219, yes, Your Honor.

THE WITNESS: Yes, sir.

Q. (BY MR. GREEN) Do you recognize Government Exhibit No. 219?

A. I do, sir.

Q. Did you participate in the production and making this exhibit?

A. Yes, sir.

Q. And does this reflect your understanding of the relevant events that occurred that led to data collection by third party forensic firms?

A. As far as the computer evidence, yes, sir.

Q. Yes. Computer digital evidence we are talking about.

A. Yes, sir.

Q. Thank you.

MR. GREEN: I would move Government Exhibit No. 219 into evidence, Your Honor.

MR. ETHINGTON: No objection.

THE COURT: Admitted.

Q. (BY MR. GREEN) Agent Lynd, is this an enlargement of that same exhibit?

A. It is, sir.

Q. So if you could go through -- If you could just describe what is on this exhibit and tell us how this timeline describes what happened as far as the digital data collection.

A. G-C Partners was hired by Exel in February 2006 to try and determine whether or not their computers had been intruded upon. G-C Partners, in order to do that, began to image computers at Exel. They started with the Dallas office, because they happened to be local and that is where the CEO was at. They imaged the computers at the local office, which I think it is Addison, but the Dallas office. They hadn't found anything there yet, so they moved onto the servers which were located in Memphis, Tennessee and began copying those. The process of copying those and then analyzing those basically went from February through March of 2006. The images were made by Ralph Gorgal and the analysis was done by David Cowen.

Q. If I can stop you right there, because I want to ask you a couple of questions about that early time frame.

Now, in February of 2006, isn't it true that Exel at the time was concerned, at first, that their phones were tapped?

A. That is true, sir.

Q. And they believed -- And this was after Mr. Musacchio, Mr. Brown, and Mr. Kelly had all left Exel and started this new firm called Total Transportation Systems. Is that correct?

A. That is correct, sir.

Q. And Total Transportation Systems, or TTS as we have been referring to it here, that was a competing firm to Exel. Is that correct?

A. Yes, sir.

Q. And during that time frame --

MR. GREEN: It is now up on the screen, Your Honor.

Q. (BY MR. GREEN) And during that time frame they hired somebody to sweep their phones to see if they were tapped. Is that correct?

A. They did something to check the phones. I don't know if it was a sweep or check for bugs, or what they did.

Q. And that firm that did that for Exel suggested -- they didn't find anything and suggested maybe they should look at their email system. Is that correct?

A. That is correct, sir.

Q. And that is when Exel hires G-C Partners to come in and look at their data systems and see if there is any breaches. Is that correct?

A. That is correct, sir.

Q. And this is long before -- well, at least months before any civil lawsuit was filed. Is that correct?

A. Yes, sir. Before the suit is filed, yes, sir.

Q. And this is before lawyers from the TTS side were even involved. Is that correct?

A. As far as allegations of intrusion, yes, sir. There were allegations of some misconduct going back and forth between the two companies prior to that that didn't relate to the intrusion.

Q. But this was the beginning of Exel trying to determine if they were being attacked from the outside. Is that correct?

A. Yes, sir.

Q. Now, then G-C Partners does an analysis, a network analysis of the data systems of Exel during that early time frame in February. Is that correct?

A. Yes, sir.

Q. And then at that point that is when there is a determination made by Dave Cowen, I believe, of G-C Partners that there were actual intrusions into the email system of Exel. Is that correct?

A. That is correct, sir.

Q. And was it at that point that Ralph Gorgal from G-C Partners starts doing imaging of computers from Exel?
A. No. He had already started imaging them in Dallas. That is when he moved out to Memphis and started imaging the ones in Memphis that they thought were intruded on. Before that he had been in Dallas doing images.
Q. And is that reflected in that first box on the right hand side that says February 14th 2006 to March 30, 2006?
A. Yes, sir.
Q. And that was Ralph Gorgal making a set of images or copies of computers at Exel both in Dallas and in Memphis?
A. Ralph Gorgal made most of them. Again, Mr. Loper did make four.
Q. Are we relying on any computers made by -- images made by Mr. Loper?
A. No.
Q. Then what is the next thing that happens on that timeline?
A. Early April, I can't remember what day the actual lawsuit is filed. It says there April 3rd the lawsuit is filed is the next thing, and the Court orders basically there is a preservation of the computers at both Exel and Total.
Q. And does that prompt another round of copying by Mr. Gorgal?
A. Yes, sir. But he only copies some of the computers this

time, not all of them this time.

Q. But included in the ones that Mr. Gorgal copies on that box, the second orange-colored box on the right-hand side, April 3rd to April 4th, that also includes some of the machines that were copied earlier.

A. Yes, sir.

Q. But it specifically included the IIS servers.

A. Yes, sir.

Q. And just so we all understand, what is an IIS server, just briefly?

A. When somebody uses your computers -- if you are a company and somebody is going to your company's computers to look at your web page, et cetera, and if you have an email accessible via the web, that is the computer that conducts the transaction that allows an outside person to use your website to do business with you.

Q. And that was copied twice by Ralph Gorgal. Is that correct?

A. That is correct, sir; once early in or mid March and once early in April.

Q. And you have copies of both of those sets of images. Is that correct?

A. Yes, sir.

Q. The TRO ordered both sides to do copying. Is that correct?

A. That is correct, sir.
Q. And did TTS also start doing copying at that time?
A. No. Andy Rosen copied TTS -- TTS wasn't copying on it their own. Andy Rosen copied it.
Q. Well, according to the Court order, TTS needed to get them copied; Andy Rosen's firm does the copying.
A. Yes, sir.
Q. Did Ralph Gorgal or anybody from G-C Partners participate in the copying of those machines at TTS that was done according to this, so on April 7th through April 9th --
A. No, sir. According to both Mr. Rosen and Mr. Riehl, who works for TTS, what occurred was Andy Rosen flew out, Tom Riehl went into a room with him and basically brought him one computer at a time, watched as -- The computers were turned off when they came in, watched Mr. Rosen take the hard drive out of each computer, make a copy, put the hard drive back in, then he would take that computer out, bring a new computer in, et cetera, until all the copies were made. Mr. Rosen did have an assistant with him. I can't remember his name.
Q. It wasn't Ralph Gorgal, was it?
A. No.
Q. After -- And you have copies of those images, too. Right?
A. No, I have the originals of those --
Q. The original images. Okay.

Later in this timeline, there is May 5th, 2006, Alvarez and Marsal. Can you explain that?

A. Yes, sir. At that point Thompson & Knight thought there might be some truth to Exel's allegations and started doing their own internal review to see if there was truth to the allegations from Exel. Thompson & Knight hired Alvarez and Marsal to come in and start collecting and conducting a review to see if that was the case. They brought Alvarez and Marsal in. Again, Mr. Riehl sat there while -- or actually hit the keys. Alvarez and Marsal didn't actually touch the keyboards. But at their direction he did something called a mail merger, which is basically take all the mail stores of all the individuals and, including from the back-ups, and produce them for Alvarez and Marsal. Then subsequent to that they actually provided all of the back-up tapes to Mr. deCraen.

Q. Now, we heard your testimony earlier about there was these other computers that were hanging around for years that were discovered much more recently; in fact, very recently?

A. Yes, sir.

Q. And are they from that time frame; the same time frame that is on this timeline?

A. They are, sir.

Q. And we also heard that there was back-up tapes that were also found that were from this time frame back then. Is that correct?

A. That is correct, sir.

Q. Now, so that is all within this timeline that is on Government's Exhibit No. 219.

A. I think technically that May 5th is actually the date they start the collection there. I think it actually takes a couple of days. It should show more than one day.

Q. So is it your testimony by the end of May of 2006 that all the Government's evidence relates -- all the digital evidence relates to this time frame to the end of May of 2006?

A. All of the digital evidence we are relying on for the offense charged. We do have some additional evidence that was collected later that relates to some potential enhancements at sentencing time, but that doesn't relate to the collection at this time.

Q. Okay. Now, you heard Mr. Ethington talk about Government's [sic] Exhibit No. 16 and some kind of audit that was done on behalf of TTS or on behalf of Exel at TTS sometime in late 2007?

A. I think October/November, yes, sir.

Q. And was that because, as part of the civil suit, TTS was ordered to get rid of anything that was obtained from the Exel system or from Exel that they weren't supposed to have?

A. That was what I was told by both representatives of Total and Exel.

Q. And to verify compliance with that, there was an audit

that was being conducted at TTS to make sure they complied with that. Is that correct?

A. Correct. But that audit was on the live systems, not on the images that had been made for evidentiary purposes.

Q. It didn't even involve any of the already collected evidence that the Government is relying on. Is that correct?

A. That is correct, sir. It didn't touch that.

Q. You were asked a lot of questions about chain of custody documents, and you said that they were important documents. Is that correct?

A. Yes, sir.

Q. You also testified that in this case that the evidence that was collected by Ralph Gorgal back in 2006, that you took time to try to independently corroborate that with other evidence that Ralph Gorgal or G-C Partners had no connection to to make sure that the evidence that Ralph Gorgal collected was reliable. Is that correct?

A. That is correct, sir.

Q. And you gave us an example of emails that contained -- I believe what you were telling us as in the indictment and several or many of the overt acts that there were emails between Mr. Musacchio and Mr. Brown that included excerpts from emails from the Exel email system.

A. That is correct, sir.

Q. And you looked at those emails and looked at when those

emails were being traded and then compared the emails that you have to the logs from the Exel web mail system. Is that correct?

A. In part, sir. I also compared them to the returns from Comcast, Verizon. I also compared them to the statements provided to me by Mr. Brown, Mr. Kelly, employees of Exel, employees of Total, such as Mr. Ebbinger, Mr. Vielhaber, Ms. Shipp, some of the board members of Total, including Mr. List, so I tried to confirm them from multiple Venues.

Q. Not only did you do the corroboration with other evidence; you looked at the sets of images that were collected by Ralph Gorgal himself. Right?

A. I did.

Q. Now, these are two sets of images obviously separated by time.

A. That is correct, sir.

Q. Did you -- And you testified previously that you looked at the images themselves to see if they were successfully imaged.

A. I looked at the logs for the images. There is a log that is generated. The image itself doesn't contain that data.

Q. Okay. So the log for those images, did they indicate that they were successfully obtained in images?

A. They did.

Q. And correct me if I am wrong, part of the process -- And

this is automated in these tools that are being used by whoever does imaging. Is that correct?

A. That is correct, sir.

Q. Including Mr. Gorgal using commercial tools to do this imaging.

A. That is correct, sir.

Q. And those logs indicate that the image was successful.

A. That is correct, sir.

Q. And it also reports back check sums, or what we commonly hear called cache values. Is that correct?

A. Cache values, yes, sir.

Q. And a hash [sic] value is in mathematical algorithm that will essentially, for lack of a better term, fingerprint a set of data so that you can compare a copy of it and see if it is the same set of data that it is supposed to be a copy of. Is that correct?

A. That is correct, sir.

Q. And after you collected the original images from Ralph Gorgal that he collected on those two occasions from the Exel system, did members of the RCFL, the regional computer forensic lab, compare those check sums, those algorithms to make sure that the images that they had were, in fact, copies of the system that they were supposed to be -- that they purported to to be?

A. They did, sir.

Q. And did that match? Did those check sums match?
A. They did, sir.
Q. Now, with all these points, these independent points of corroboration, that Mr. Gorgal or G-C Partners had nothing to do with, that corroborates the logs and the other digital evidence collected by Mr. Gorgal, included in that you said there was things like interviews of employees, you know, there was the records from internet service providers, there is emails between Mr. Musacchio and Mr. Brown themselves that come from their personal accounts, and things like that. Is that correct?
A. Yes, sir.
Q. Included in that also, just so we are clear, if there were an allegation that Mr. Musacchio never went into the Exel system and took copies of email text and sent them to Mr. Brown, don't we also have an admission by Mr. Musacchio in the civil case that he did that on at least one occasion?
A. There is, sir.
Q. The tampering allegations you were asked about by the Receiver, that involves G-C Partners. Is that correct?
A. I was asked that by Mr. Ethington. He is not the Receiver.
Q. The allegations made by the Receiver that you were asked by Mr. Ethington about.
A. Yes, sir.

Q. And that involved -- Those allegations involved G-C Partners. Is that correct?
A. They involved two of the employees of G-C Partners, yes, sir.
Q. And you were involved in that investigation that was referred by the Receiver. Is that correct?
A. Yes, sir.
Q. Is there anything in that investigation that identifies Mr. Gorgal as being one of the people that is suspected of tampering with evidence in that other case?
A. No, sir.
Q. And that other case is separated in time by what? About three and a half years?
A. 2006 to 2009, so maybe just under three years.
Q. Somewhere around a three-year period from the collection of the data in this case to the collection or the imaging in that other allegation the Receiver has made. Is that correct?
A. Yes, sir.
Q. So it is separated by three years, and it doesn't involve Mr. Gorgal at all. Is that correct?
A. That is correct, sir.
Q. You were asked about the missing hard drive from the laptop at Exel. Did the fact that a hard drive was missing have anything to do with the data collection that Ralph Gorgal made from the Exel system?

A. No, sir. You can't collect data from something that doesn't exist.

Q. In fact, this was a laptop machine that was assigned to -- You can't recall whether it was Mr. Brown or Mr. Kelly. But by the time Ralph Gorgal is there in February of 2006, isn't it a fact that Mr. Brown and Mr. Kelly had long been gone from Exel?

A. I believe September and October 2005, respectively.

Q. So this is an old laptop that was assigned to one of them at some time the year previous.

A. Yes, sir.

Q. You were also asked about deletions from the TTS machines, from the Total Transportation Systems machines. Did those deletions -- What exactly were those deletions?

A. In effect, there were emails between Mr. Brown and Mr. Musacchio that were in the back-up tapes but were not in the live system, so all of that had been deleted. There were files that were part of those emails that had been downloaded that were also deleted. There were emails between Mr. Brown and Mr. Musacchio in which Mr. Musacchio directs Mr. Brown to make sure that Mr. Kelly has deleted those files. Then there is some conversation reported to me by Mr. Brown and Mr. Kelly both on the day that the lawsuit is filed, or the day after, I can't remember which one of the two, about whether or not -- Mr. Musacchio is asking them whether they should be deleting

emails, and those are the emails that appear to be missing.

Q. And do these missing emails -- Well, do you -- If these emails are missing, isn't it logical that the emails were deleted by Mr. Musacchio or Mr. Brown or Mr. Kelly?

A. Yes, sir.

Q. Given the time frame of when those deletions occurred, would it have been Andy Rosen?

A. No, sir. They occurred prior to Mr. Rosen arriving on scene. The systems were all turned off when he got there.

Q. You were also asked by Mr. Ethington about analysis that may have been done by Deloitte & Touche. Are we relying on any analysis done by anyone other than the FBI in this case of digital evidence that was collected?

A. Not for our case in chief, no, sir.

MR. GREEN: May I have one moment, Your Honor?

THE COURT: Yes.

MR. GREEN: Thank you, Your Honor. That is all the questions I have.

THE COURT: Mr. Ethington?

MR. ETHINGTON: Briefly, Your Honor.

REDIRECT EXAMINATION

By Mr. Ethington:

Q. You have told us, I think, that you are not relying on a fellow named Loper and a fellow named Cowen's work product in your investigation and the prosecution of this case. Was that

your testimony on cross examination?

A. We are not relying on any of the images Mr. Loper made. Those were all -- They are -- All of them, I believe, were spares, and there is not anything of evidentiary value on those. and then we are not relying on any of the analysis Mr. Cowen did as far as presenting it. Did I listen to him when he first talked to us about it? Obviously when we first came in I heard what he had to say and that helped me focus my attention on the IIS logs first as opposed to checking somewhere else first on these.

Q. Let me interrupt. IS log?

A. IIS. That is the internet information server. That is that web server.

Q. Okay. So you did rely on them?

A. No, sir. That was basically pointing a direction. I didn't rely on anything he had done. I independently did that analysis on there.

Q. You determined, though, in your investigation that in the work done for Exel that Cowen and Loper did a substantial amount of work, that collection of and mirror imaging and work on the computer systems of Exel.

A. No, sir. Gorgal did the collection; Cowen did the analysis.

Q. Well, but you have seen where Loper was involved in that, too, that project.

A. Yes, sir. There were four -- I think there is 40 some odd, maybe like 38, something like that, different machines that were copied, and 4 of which were Mr. Loper. That is less than ten percent or about ten percent. To me that is not substantial. But Mr. Cowen did not do any of the imaging, and Mr. Gorgal didn't really do any of the analysis.

Q. Was it Mr. Loper that took the Fifth Amendment many, many times in questions propounded to him in the courtroom on a deposition about his activities of mirror imaging and working in computers?

A. In -- Pertaining to the Randall investigation?

Q. Yes.

A. I believe so, yes, sir.

Q. Okay. So a fellow who took the Fifth Amendment had done ten percent of the work time-wise on the Exel matter.

A. Not time-wise. That is computer-wise. He didn't do any of the big computers. The big computers take longer. But he also didn't do any of the images that we are looking at or using in our case.

Q. You mentioned Brown and Kelly in your cross examination. You determined from your investigation, and maybe interviewing them, since they have entered pleas of guilty, that they remained in the offices of the places of Exel for a couple of weeks after they resigned or was fired with access to the computer systems?

A. Well, they had access even if they weren't physically there because they had the administrator passwords and they could log in remotely, so technically they had access all the way up until April whatever it would have been, April 3rd when they changed the passwords.

Q. Right. But they not only had access to these computer systems at Exel, but they also were physically present for one week and two weeks after they resigned and were fired.

A. There was a period. I am not sure how long. It might have been two weeks. I don't remember without looking at the HR records.

Q. We talked about Alvarez and Marsal on direct and cross. Do you have, for the Judge's benefit, the date in which they handled these back-up tapes that you rely on so heavily?

A. That they handed them to us or they got them from?

Q. That they got them from.

A. I don't have it in front of me. I am sorry, sir. I have that from elsewhere, but I wasn't expecting to be up here so I just don't have it.

MR. ETHINGTON: May I get that just to refresh his memory, Your Honor?

THE COURT: Yes.

MR. ETHINGTON: May I approach?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) I am handing you this chain of

custody document for Alvarez and Marsal that was produced by the Government.

A. Yes, sir.

Q. Does that give you the date?

A. May 5th, sir.

Q. May 5th of?

A. 2006, sir.

Q. So the computer records that you rely on get into, I guess you are not familiar with them, but reliable hands, I will stipulate, in May, May 6th, 2006. Right?

A. Sir, again, that is a portion of the computer records we are relying on. They did not -- For example, Alvarez and Marsal did not copy the BlackBerry exchange server. They just used the back-up tapes. They weren't actually down there copying servers. That was Andy Rosen. That would have been April 4th. So when you say it got into reliable hands, a portion of the data got into Alvarez and Marsal's hands on May 5th. A portion of the data, which was collected by Andy Rosen, got into Andy Rosen's hands on April 3rd and 4th and 5th, whatever day it was in there, April 7th, according to this, through 9th. A portion of the data was collectsed at Exel by G-C Partners between February and April of 2006. They are all different portions of the data, sir.

Q. Yes. This is -- Alvarez and Marsal, they don't have anything to do with Exel. They did work with TTS. Right?

A. Correct, sir. But they didn't copy everything at TTS. I am pointing out there is -- They are looking at the mail. Andy Rosen copied everything and did it about a month earlier. He didn't copy the back-up tapes because, for whatever reason, that wasn't included on the TRO. So the first time the back-up tapes come into the hands of a forensic firm would have been that May 5th, but there are other servers -- For example, the mail servers themselves were imaged in April.

MR. ETHINGTON: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. ETHINGTON) I am going to hand you a collection of -- It says Dave -- Dave Cowen on it. Do you see that? And it is to Rudi. You know Dave Cowen, of course.

A. Yes, sir.

Q. Do you know who Rudi is?

A. I do not, sir.

Q. I am trying to think of his last name.

A. It says here Peck, but I don't know who that is, sir.

Q. Employee of G-C Partners. Okay. What is that on the front page there?

A. It appears to be an email from Rudi Peck to Dave Cowen.

Q. Two guys at G-C Partners?

A. Yes, sir.

Q. Okay. And then the next page it appears to be attachments to it. Do you see those?

A. Yes, sir.
Q. Do you recognize them at all?
A. I do not, sir.
Q. Does it have information on it regarding this case; the name Mike Musacchio --
A. It appears to be, sir. But, again, all of this appears to be -- Let me have one minute to read this. It appears to be some kind of an inventory of things that have been provided to G-C Partners from somebody else. It doesn't necessarily say where. I am trying to find where.
Q. You see those names on there. Those are either Defendants in this criminal case or persons that were investigated and not indicted in this criminal case, aren't they?
A. Let me look at all the names. Ms. Fox was never an unindicted co-conspirator; but the other ones, yes, sir.
Q. Okay.
A. I don't know what it is, sir.
Q. Do you see where it references logs like we have had testimony about on direct and cross?
A. Like referring to the application event logs or system or security logs?
Q. Uh-huh.
A. Those are different kind of logs than we were talking about, sir.

Q. Okay. Let's look at the back pages. Are those the type of logs you were talking about?
A. No, sir.
Q. Okay. Go one page over. The other way. See where it says "logs"?
A. Again, no. The DHCP would be somewhat relevant, but those aren't the kinds of ones we are talking about. DHCP logs would save internally to the network, which computer internally it was accessing an account.
Q. Okay.
A. But the I.P. addresses from the time period we are referring to generally are external. I believe there might have been some internal while Mr. Brown was still there where he was looking at the email, but those come straight back to his computer. You would have to go through the DHCP logs to get that.
Q. Okay. You lost me, but I won't -- Let me show you the front page, or the second page actually, where it references Mike Musacchio's desktop and Mike Musacchio's laptop. Do you see those?
A. Yes, sir.
Q. And here where the asterisks is in bold print it says, "Internet history only available for the following two days." And it is March 26th of '06 and April 10th of '06. That is for his desktop. And then "Internet history is only available

for the following day," and that is April 7th of 2006?

MR. GREEN: Your Honor, I am going to object to this. Mr. Ethington is reading from a document that hasn't properly authenticated and appears it can't be properly authenticated by this witness, so I would object to that.

MR. ETHINGTON: I am going to ask him just if he knows what that means.

THE COURT: All right. And you have gone way beyond the scope of the cross, counsel. You need to wrap this up. You are just starting all over again.

MR. ETHINGTON: This will be my last question.

THE COURT: All right. Go ahead.

THE WITNESS: Sir, I can make an educated guess on that based on what they are saying, but since I didn't perform that analysis, nor do I know particularly exactly which ones they are doing here, this looks to me from this and the fact that it talks about TTS computers that this is them examining a copy of the images provided by Andy Rosen. I can't know for sure because it doesn't say that specifically, but it mentions TTS computers here so I have to assume that would be the case when it is talking about TTS computers, and that is the only place they could have been obtained from.

If that is the case, that would match up with what I said about that there is things that are missing, there is data that is missing when I looked at it that would tend to

indicate things had been deleted.

Q. (BY MR. ETHINGTON) In your investigation, did you find that the internet history for Mike Musacchio was limited?

A. I didn't look at the internet history. It wasn't relevant to what I was looking at.

MR. ETHINGTON: That is all we have, Your Honor.

THE COURT: Mr. Green, anything else?

MR. GREEN: No, Your Honor.

THE COURT: Agent, you may step down.

THE WITNESS: Yes, sir.

THE COURT: Any additional evidence you wish to present as far as the motion to suppress?

MR. ETHINGTON: No, Your Honor.

THE COURT: And Mr. Green, Ms. Groves, any evidence the Government wishes to present?

MR. GREEN: No, Your Honor.

THE COURT: Mr. Ethington, I will hear from you on your motion to suppress.

MR. ETHINGTON: Very briefly, Your Honor.

This is an unusual situation where you have got the computer forensic analysis people are presently under federal criminal investigation for--and I am not talking about drunk driving or something like that--destruction or intentional manipulation or deletion of electronic evidence. And you can see that this company that is under investigation is linked

and connected directly to all of the entities that are involved in this case, including the U.S. government.

Now, you know, without trying that lawsuit in this hearing, that should give the Court sufficient pause or question as to whether or not the evidence that was accumulated later by the FBI. I am not criticizing the FBI. I am criticizing the evidence that was produced by these people and then given to the FBI much later on, a couple of years later on.

You have also gotten a showing that the access and the storage and the review and the analysis by untrained people--that is, at the law firms; you heard the testimony that the agent can't be responsible for the handling or deleting or reviewing of this electronic evidence before it gets into a secure place--that is a sufficient showing, and also that it is unreliable and should not be used in a criminal proceeding in this context, and we ask that it be suppressed.

THE COURT: Thank you.

Mr. Green?

MR. GREEN: Your Honor, I only need go back to Mr. Ethington's filing in this in which he alleges that the Government participated in the tainting of evidence, which clearly hasn't been established by Mr. Ethington. In fact, there is no evidence at all of tainting of evidence in the

Government's case. There hasn't been any established here today.

What we hear today is Mr. Ethington has some issues with how G-C Partners and Ralph Gorgal documented what they did, but we heard from the FBI that said, number one, that they looked at the images and they are valid images, they looked at the data in those images and the data is corroborated by other sources. There is no indication whatsoever established by the Defense that there is any tampering or tainting of evidence in the Government's case.

What does the Defense want you to do? They want you to drag in allegations, unresolved allegations from three years later that don't even involve Mr. Gorgal, who did the imaging that the Government is relying on, and try and suggest that just the mere fact that there is unresolved allegations three years later in a wholly separate case, that that is enough to say that the evidence in the Government's case is unreliable. That has not even -- We are not even close to enough evidence to even get anywhere near making a finding like that.

What Mr. Ethington did well today is try to confuse all the issues in the case. He is trying to confuse what the Defendants may have done with evidence to what happened during the collection of evidence. What the Defendants did to evidence in this case is going to be heard by the jury. The jury can hear that. That goes to their guilt, not to whether

the evidence is reliable, the evidence that we are left with after the Defendant's tampering with evidence. It is what we are left with is the evidence that the jury is going to hear.

What Mr. Ethington also tries to do is he also tries to mix up two separate concepts--analysis with collection of evidence. The Government is not relying on analysis by Deloitte & Touche. It is not relying on analysis by G-C Partners. Analysis is what happens after evidence is collected. It is the evidence is collected, a copy is made, a good copy is made so that we can rely on that, and then somebody looks at it to see what does this evidence mean. We are not relying on anything anybody else did. The FBI did that part of the analysis of what the jury is going to hear in this case. That is of no moment what law firms did, what they didn't do in analysis. The analysis the jury will hear is from the FBI.

So given all that, I would ask Your Honor to reject the Defendant's motion to suppress in this case.

Thank you.

THE COURT: Thank you. Anything else?

MR. ETHINGTON: I don't feel like it is necessary, but the motion was filed -- the motion to suppress was filed in January of this year based on the amount of evidence we had available to us at that time and our limited ability to try to analyze the discovery evidence that was available to us at

that time.

I am not accusing the Government of tainting the evidence. I am saying that the Government acquired tainted evidence in the collection process. That is all we had.

Now, we knew that G-C Partners was under contract with the Government and that they are under investigation by the Government also. That is all we knew. Now we know a little bit more about that. But I want it clear, I am not accusing them of manipulating or tainting the evidence. If the motion says that, it was poorly written by me.

Now, I know they are not relying on analysis done by these private entities, but they are relying on all of the collection, supposed preservation, which there wasn't any, and then the tainting and the manipulation of this evidence. When you shut down a computer it modifies the entries of the the electronically stored information. When you turn it back on, it modifies it. When you scan through it, it modifies it. And then after all of that activity was done over a period of months and then some mirror imaging, and then storage for a few years, it has been tainted. It has been adulterated. It has been tainted, Judge, and they know it. So what they are trying to do is get around all of that and try to ignore the people that are under investigation and their participation in the gathering of this evidence and the handling of this evidence, they are trying to ignore it and they are trying to

separate themselves from it, and they are trying to start over again several years after the events have occurred and after everybody stuck their hand in it, their oar in the water, or stirring the pot at Thompson & Knight, Strasburger, all the associates and partners that may have reviewed.

And they didn't have any bad intent either. But by doing this and surveying it, they have tainted it to where it shouldn't be used in a criminal proceeding at this point.

Thank you.

THE COURT: Thank you.

Well, and I have considered the evidence, I have read the briefs, the motions filed by the Defendant, the Government's response, and I don't believe there is any legal basis for suppressing the evidence the Government intends to produce in this case. You have not shown anything that the Government did that, of course, would lead to suppression. You are relying on some allegations by some third parties, but I think the Government has shown, at least preliminarily here, that the evidence is reliable.

The issues that you have raised, while they may be issues for the jury, the fact-finder, it is for the jury. I think all that goes to the weight.

And so the motion to suppress is denied.

Why don't we take a break let's take a break until 11:25. We will come back in and take up the *Daubert* motion, and then

we have several motions in limine. We will take those up then.

(Brief recess.)

THE COURT: All right. Mr. Ethington let's take up you -- I guess it would be your supplemental motion on the *Daubert* hearing.

MR. ETHINGTON: Yes, sir. There is a scheduling situation with the Government's witness, and they suggest that we might take the motion in limine regarding the Receiver's report first in order to accommodate a witness.

THE COURT: That is fine.

Mr. Groves or Ms. Green, who is going to address that?

MS. GROVES: Mr. Green will address that, Your Honor. And I think there has been a change.

MR. GREEN: Your Honor, we have Mr. Wills available to testify if necessary, but I doubt that Your Honor wants to hear more evidence --

THE COURT: Testify on what?

MR. GREEN: The motion in limine, the Government's motion to limine to preclude the Receiver's allegations.

THE COURT: The third motion in limine?

MR. GREEN: Yes.

THE COURT: I think that is what it is called. And his testimony would go to what?

MR. GREEN: Your Honor, his testimony would actually

just amplify the testimony that you heard from Agent Lynd, and that is as to the reliability -- the effort to independently determine the reliability of the Government's evidence in this case. But given the fact that you have already heard that from Agent Lynd, I don't know if it is necessary.

THE COURT: And I agree. I don't think that is necessary. And then, frankly, I don't know -- I think the issues of reliability in terms of the evidence that you are relying on in your case in chief, as I stated earlier, that goes to the jury. They are raising some issues with that. Those are issues for the jury. But I don't know that that is the basis for whether or not to admit these allegations that are being raised in this the SEC versus Randall. I think those are really kind of separate issues. I will hear from you on that, but you are right. I don't need to hear any additional evidence.

MR. GREEN: So with the Court's permission, if we can excuse Mr. Wills.

THE COURT: Yes. Mr. Wills, you may be excused. Thank you.

MR. GREEN: Your Honor, our argument is essentially -- has several points. One is there is questionable relevance of the Receiver allegation in the Government's case, and I say that because the -- because the Government's evidence is independently reliable, or has been

shown to be reliable with independent sources, and the lack of any allegations specifically about any kind of corruption or taint or anything wrong with the Government's evidence. I know Mr. Ethington is arguing that people have access. That is not specific evidence of taint. So absent evidence of taint in the Government's case, it makes allegations three years later involving other people at G-C Partners less relevant. Also the fact that that hasn't been resolved makes it less relevant.

As Your Honor well knows from the motions that you have heard yesterday and what the Government has been saying all along about the Receiver allegations, is that the Government had serious questions about the conclusions made by the Receiver's expert, which is really the basis of the allegations.

So that leads me to the next point of why Your Honor should preclude the evidence of the Receiver's allegation in the Government's case, and that is that to allow that in the Government would have to litigate that entire issue in front of our jury on an unrelated case, which is our 403 -- Federal Rule of Evidence 403 argument, is that it is going to confuse the jury, it is going to take an incredible amount of time on some unrelated matter, and it is likely never going to get resolved to the satisfaction of anybody under these circumstances. That investigation should run its course and

it shouldn't be litigated in our case.

So that is in essence what the Government's argument is on the motion in limine is that it is marginally -- it is very suspect, the relevance of that evidence, and the fact that there is no taint alleged in our case, and the fact that it is going to be an incredible messy litigation of something unrelated to our case in our case.

THE COURT: Thank you.

Mr. Ethington?

MR. ETHINGTON: Well, Your Honor, if it is messy, this Court is used to seeing messy evidence presented, if it is done in an expeditious fashion and it assists the jury in evaluating evidence or testimony gathered by G-C Partners in this case.

Now, they would like to just ignore the fact that this Cowen and Loper participated in the gathering of this evidence in this case. Now, if we have evidence available to us that would impeach their credibility and their methodology and the way that they conducted business generally --

THE COURT: And would credibility be an issue? I expect Mr. Loper and Mr. Cowen aren't going to be witnesses for the Government.

MR. GREEN: That is correct, Your Honor.

THE COURT: They aren't going to be here, so there is no credibility -- As far as their credibility of witnesses,

there is nothing to attack.

MR. ETHINGTON: But their evidence is going to be here, and that is my obligation.

THE COURT: Well, Mr. Cowen, the testimony was he didn't collect, he didn't make any images, he didn't collect any evidence. He made an analysis. They aren't going into that analysis. They aren't going to present that to the jury. Mr. Loper imaged, apparently, about four computers, and they aren't using those images. They aren't using that evidence, if my understanding is correct.

MR. GREEN: That is correct, Your Honor.

THE COURT: So they aren't using that evidence in this case. They aren't relying on that evidence and they are not relying on Mr. Cowen's analysis, his conclusions in order to present their case. So what is it that you are impeaching, then, or attempting to attack or to impeach?

MR. ETHINGTON: The gathering of the evidence. We are both at a disadvantage here this morning, Your Honor, because we have just received a couple of days ago, both of us, the invoices that G-C Partners submitted for their work on this case, on the Musacchio case, and in those invoices for time spent it lists Cowen and Loper. Now, there is one month missing that we have to go back and revisit.

THE COURT: But that is pretty broad. They have acknowledged that Mr. Cowen has made analysis, and they have

acknowledged that Mr. Loper examined computers, so you would expect entries. Are you disputing that that is the extent of their involvement?

MR. ETHINGTON: Yes. I think that these invoices will show that it was more extensive than that. I think the evidence might show it is more extensive than that. And I am not accusing them of minimizing it. I am saying they didn't have the benefit of these invoices either until two days ago.

THE COURT: And are you also, then, disputing their statements and their position that they are not relying on the images that were made or collected or gathered by Mr. Loper?

MR. ETHINGTON: Yes.

THE COURT: And that they are not relying on the analysis by Mr. Cowen. So you are disputing the position that they are not relying --

MR. ETHINGTON: Sort of, Judge. I am kind of disputing it by this. They are relying on the raw evidence that was available to Cowen and Loper in the critical part of the investigation, their investigation. Actually it was the civil investigation that gave life to this criminal investigation. And they were there. They were on-site. And they have been accused, reasonable suspicion --

THE COURT: You say "they," but, again, that is painting broadly. Who has been accused is Mr. Loper and Mr. Cowen, and they are saying, "We are not using any of their

product."

MR. ETHINGTON: Well, G-C Partners.

THE COURT: Well, but G-C Partners because of the actions of Mr. Loper -- It has to be individuals that are engaged in the misconduct, and the individuals are Mr. Loper and Mr. Cowen. Those are the allegations. And the Government is saying in this case, "We are not using any of their work product, any images that Mr. Loper may have collected and any analysis done by Mr. Cowen. We are just not using that as our case in chief. That is not our case."

MR. ETHINGTON: They aren't using the work product of those two individuals, but they are using the evidence that those two individuals had access to.

THE COURT: So what if they had access to it? Mr. Cowen may have had access to it to reach his analysis, but they -- ultimately they are not relying on his analysis. That doesn't taint anything. They are not relying on that. The evidence was, the testimony, that those copies were made and then work copies were made, and that is what the work was done off of. The subsequent work was performed using those work copies.

And then Mr. Loper, he imaged certain computers, but the Government says, "We are not using those images here. That is not part of our case in chief. That is not part of our allegations. It is not part of the evidence against your

client."

So what is there to attack? If that is true, what is there to attack? Other than you are wanting to make an issue out of it, but if that is true, what are you attacking, then? If you are not using Loper's images, they are not using Cowen's analysis --

MR. ETHINGTON: Judge, I think if the evidence is fully presented -- And I am not trying to litigate some case with the SEC --

THE COURT: But that is what we will wind up getting into it.

MR. ETHINGTON: All I am trying to do is show that -- and I respectfully submit to the Court here that if we show to a reasonable jury that the raw data, the evidence was accessed and made available --

THE COURT: When you say "raw data," what are you referring to?

MR. ETHINGTON: The Exel computer system.

THE COURT: Okay. The ones that were imaged back in '06.

MR. ETHINGTON: Yes. And before it was imaged.

THE COURT: Right. You can go into that. You have already raised the issues here that Kelly and Musacchio were there and, of course, the Government acknowledged they had access to it even after they were gone, and so what could have

happened between -- during that time and then '06 when they were imaged, those are still there without getting into the SEC.

MR. ETHINGTON: I think it is going to be important for this jury to know the quality of the evidence and how it was handled, how it was gathered. That is real critical --

THE COURT: I agree with that, and you can certainly go into that in terms of what they did, but that is going to be Mr. -- What is his name?

MR. GREEN: Gorgal.

THE COURT: Mr. Gorgal. That is the witness that the Government is relying on, the individual, he gathered or imaged made those images, they are relying on that evidence. So what he did, how he gathered, of course that is proper for cross examination and for you to question before the jury. But none of that gets you into the SEC lawsuit.

MR. ETHINGTON: My perception of Mr. Gorgal's position with G-C Partners as it relates to Exel and the law firms, and then Cowen and Loper and another staff of people, was that Gorgal was really what I will call the account representative to the client, and that the hands-on work was done primarily by Cowen, Loper, and a staff of people. I think that is what the evidence would indicate.

THE COURT: How are you proposing to get that evidence before the jury? Through the findings of the

individual? Who is the individual that we have been fighting over the subpoena?

MR. GREEN: Mr. Fogarty.

THE COURT: Yes. His report. How are you planning on getting into that there are allegations as to tampering and tainting evidence?

MR. ETHINGTON: The allegations?

THE COURT: Yes. The allegations in the SEC's suit that the Receiver is making against Mr. Loper and Mr. Cowen. How are they planning on presenting that to the jury?

MR. ETHINGTON: Through the partner Mr. Gorgal.

THE COURT: Just ask him whether they are under investigation?

MR. ETHINGTON: Yes.

THE COURT: All right. And you see that as relevant in attacking the credibility.

MR. ETHINGTON: Yes. Of the entire investigation, because they handled the evidence. I think that testimony will show that.

And I think the jury has a right to hear, you know, the quality of the work that was done at the inception of the case --

THE COURT: I agree with that, but that doesn't get you into the SEC lawsuit necessarily.

MR. ETHINGTON: I guess I am misunderstanding and I

apologize.

THE COURT: I am not understanding you, then.

MR. ETHINGTON: I don't plan on litigating this SEC case, but I do think the Government has a -- I mean the jury has a right and the Defendant has a right to let the jury know how this evidence was accumulated, and by whom, and what those people -- what their methodology is, what they do, because it is real critical --

THE COURT: And if the Government says "The one we are relying on is from Mr. Gorgal," then you can get into what he did, what methodology he used, and whether that was appropriate or not. I think that is fair questioning, and you will be entitled to do that. But I don't know how that gets you into the SEC lawsuit, if you are questioning Gorgal, because that is the evidence that they say they are relying on.

THE COURT: I don't plan on making the SEC pleadings like an exhibit, or something like that. I do plan on developing testimony, though, about the methodology of the people that worked with Gorgal and they worked on this case. And they had questioned --

THE COURT: I think you can do that. But then somewhere in there you want to get into the SEC allegations and then bring up the fact that they are being -- facing these allegations and being investigated.

MR. ETHINGTON: By the FBI; not the SEC.

THE COURT: It is in the SEC lawsuit but the FBI, that they are being investigated and those allegations arose out of that.

MR. ETHINGTON: There is a ongoing case going on.

THE COURT: Is this 608? You know, it is not a criminal conviction.

MR. ETHINGTON: Bad acts, yes.

THE COURT: Bad acts. And, of course, 608 states that extrinsic evidence is not admissible. All you can do is cross examine them on it and then that is it. And so that is all you are planning on doing?

MR. ETHINGTON: Yes.

THE COURT: And even if they don't testify, you think that that would be admissible and relevant under 608? Because that is generally going to attacking the credibility of a witness of somebody who has testified, and I think 608 by its terms talks about that.

MR. ETHINGTON: Yes, it does.

THE COURT: And they are not going to be witnesses here.

MR. ETHINGTON: It means the evidence really; not just a particular witness. I mean, if I am not allowed to test the reliability of this --

THE COURT: No. You are painting too broad of a

brush. I am not saying you are not allowed. I am saying you are not allowed to bring in this evidence about Receiver allegations against these two individuals in the SEC lawsuit. You can test it. There are other ways of testing, like we have discussed. You can certainly test what was done. But I am saying the question is are you going to be entitled to test it by bringing in evidence of these allegations of this investigation. That is the only issue we are dealing with. And you are trying to make this into, "Well, I am not allowed to test it." Of course you will be allowed to test what they did. The issue is will you be allowed to test it by questioning on these allegations. That is the issue that we are dealing with.

MR. ETHINGTON: And not to transition into the *Daubert* issue, but it kind of relates, it is intertwined, and that is if they are going to present Gorgal as an expert, which I think their filings indicate, in some capacity --

THE COURT: The imaging, because he did the imaging.

MR. ETHINGTON: I think that is it. But --

THE COURT: So they are going to get into what he did and then the methods, and you are entitled to question on that.

MR. ETHINGTON: Well, and the work product of the people that give him --

THE COURT: If there is such a thing, sure.

MR. ETHINGTON: If there is linkage between him and his work and Cowen and Loper, which I believe the evidence will end up showing.

So we would ask that this motion in limine either be denied or carried until we can figure out precisely, you know, some playing field here. I don't want to step out of bounds.

THE COURT: I think that is the way to do it. I am not going to deny it. I am not convinced yet that that, in fact, is relevant and that that is proper. The only way that I see it coming in would be through Rule 608. The Government is saying they are not going to call those witnesses, and so once the evidence is developed, because you say that there is going to be evidence of a tie-in, they are saying they are not relying on their work product, but you are saying there is going to be evidence of that, then maybe we can revisit it at that point.

But I will grant it to the extent of don't go into that issue, then, before the jury until you get a ruling that that is admissible.

MR. ETHINGTON: Yes. I agree with that ruling, Your Honor, because I think we don't know -- we can't predict the development of the evidence here.

THE COURT: Certainly. And I don't know all the evidence as well as the attorneys know it. I know what I have heard today and over the last few days when we have had

hearings. So I will carry that along, and then we can make a decision when the time comes.

What about the *Daubert* motion? That is your motion.

MR. ETHINGTON: *Daubert* was filed in January also.

THE COURT: And that went to a different witness than one you are raising now.

MR. ETHINGTON: Judge, kind of a review, it looks like we have co-Defendant Brown who pled guilty quite some time ago as the designated expert at first. That prompted our *Daubert* motion because we didn't know about his credentials.

And then there was designations through the course of time of others Gwendelyn Dove, for instance, who works at the lab. I will call it the FBI lab, although they are only a participant. And then Agent Lynd, and then Gorgal, and then Wills, the fellow who was just excused. And probably by memory I am leaving one out, maybe.

MS. GROVES: Jackie Northrup, Your Honor.

MR. ETHINGTON: Thank you. Who is also a computer expert?

MS. GROVES: No. She is a lab tech at the regional forensic computer lab. She did imaging or copying.

MR. ETHINGTON: So I haven't been able to determine adequately who is going to testify on behalf of the Government as an expert and in what capacity, because we have got the 701 layperson with an opinion, and then 702 expert in a certain

area.

And we have heard today even the division of these different areas of expertise; somebody is an expert maybe of collecting data, and that is all they did or do, and then somebody is an expert in the area of analyzing that data and they don't do any collecting.

And boiling that all down, then, I would like the *Daubert* motion to be considered by the Court as a request to restrict the testimony really of Agent Lynd. If he -- I don't think he has testified that he has the credentials to be a forensic analyst of data.

THE COURT: That wasn't an issue at that suppression hearing, so nobody went into that.

MR. ETHINGTON: Well, he mentioned on-the-job training and then some courses that he had taken. And you are right. I didn't flesh that out.

THE COURT: Nobody developed that fully.

MR. ETHINGTON: But in the area of expertise, if there is, of imaging, I guess, collecting data from --

THE COURT: And are you seeking a hearing on all of these individuals outside the jury before they testify, or are you wanting to object once the Government lays a predicate and then you don't think it is sufficient and we can take it up then, or what are you proposing?

MR. ETHINGTON: Candidly, I think the best way to do

it is if we can narrow it down and get not a commitment 100 percent, but a firm idea of who the designated experts are going to be, because we have this list right now and it sounds like some of those witnesses would be duplication of others, if we could identify that, and then the area of their testimony, because if Agent Lynd testifies as an expert in the gathering of evidence, we would agree with that. But if he is going to do the computer analysis testimony, we would contest that.

THE COURT: Well, why don't you --

Ms. Groves, I will hear from you.

MS. GROVES: Your Honor, we filed a notice of expert witnesses or witnesses with expertise, Document No. 55. We drew an objection from Defendant Kelly concerning the notice with respect to Special Agent Lynd. That was amended at that point to further flesh out what Agent Lynd would be testifying to. So the Government has put the Defense on notice of who our witnesses are and what they will be testifying to.

In addition to the ones that Mr. Ethington has mentioned, and I believe I also added the name of Jackie Northrup, the Government has listed Andrew Rosen as an expert witness and Levi Richardson, but we have also described what type of testimony they will be asked for at trial, the areas of that testimony.

THE COURT: All right. Mr. Ethington, why

don't -- Were you finished? I didn't mean to cut you off.

MS. GROVES: I am, Your Honor.

THE COURT: Get with the Government, then, if you need some clarification or try to establish what it is that you are trying -- where are you are trying to go and see where you are trying to go.

MR. ETHINGTON: Judge, I am not trying to be difficult about this, and I am not criticizing their filings, but as an example on page 2 of some -- Document No. 123, it says the Government will not offer Mr. Gorgal as an expert witness concerning forensic examinations other than his imaging. So I guess he can be an expert in imaging and not in the examination. And that is what I am referring to. I know they have written it clearly, but I am not able to decipher it clearly yet.

THE COURT: Okay. Well, why don't -- work on that, and get with the Government if you need some clarification. There is multiple filings I think that have been made regarding, as the motions have been filed, regarding these witnesses. See if you can get that cleared up, and then let me know what it is that you are needing.

MR. ETHINGTON: We will. Thank you.

THE COURT: Any other motions then, Mr. Ethington, that you filed that we need to address here?

MR. ETHINGTON: No, Your Honor. There is two

motions in limine filed by the Government I think that are still pending.

THE COURT: I was going to them next.

Ms. Groves or Mr. Green, anything else that we need to address here?

MS. GROVES: We had a motion in limine that I believe has been withdrawn, Your Honor. That is the one to limine out the Thompson & Knight report. I believe that was done at a bench conference.

There is also a motion in limine to preclude introduction of the civil settlement, the facts of the civil settlement without first approaching the Court on that.

THE COURT: Any objection to that? That would seem to be generally not admissible.

MR. ETHINGTON: No, Your Honor.

THE COURT: I will grant that motion in limine.

MS. GROVES: And I believe we have already dealt with the situation involving keeping out the SEC, and we understand that is going to be a carried motion.

Then the final motion in limine that the Government filed was the one wanting to limine out extrinsic evidence of the counterclaim filed by Tax Credit Services, LLC against Defendant Joseph Roy Brown in state court in Tennessee.

THE COURT: Were you intending to get into that issue, Mr. Ethington?

MR. ETHINGTON: Yes, Your Honor.

THE COURT: You were?

MR. ETHINGTON: Yeah, that is similar or like conduct alleged against Brown and expecting that he would be a witness.

THE COURT: Okay. Ms. Groves?

MS. GROVES: The basis for the Government's motion in limine is that he has not been convicted. It is a civil lawsuit that is currently ongoing in Tennessee. And under Rule 609 -- Am I quoting the right rule? I think it is 608(b). That shouldn't come in, the extrinsic evidence should not. If Mr. Brown is on the stand, I am assuming, then, that he would be subject to cross examination. But to call witnesses in that civil lawsuit or to introduce pleadings in that civil lawsuit should be precluded under 608(b).

THE COURT: Mr. Ethington?

MR. ETHINGTON: And 608(b) says that it ordinarily may not be admissible, but in the discretion of the Court. However, in the discretion of the Court, if it is probative of truthfulness or untruthfulness, it can be inquired upon or into on cross examination of the witness.

THE COURT: Right. But it does state that extrinsic evidence is not admissible, but you can inquire of the witness. But she is correct that the rule prohibits using extrinsic evidence, so you wouldn't be --

MR. ETHINGTON: I am not going to bring the pleadings in.

THE COURT: Any of those kinds of documents, that would not be admissible without getting a specific ruling from the Court. When it comes time to cross examine him on that, just let me know before you get into that.

MR. ETHINGTON: Yes, Your Honor.

THE COURT: All right. Anything else?

MS. GROVES: There is only one other outstanding motion, Your Honor. Apparently the Eastern District of Texas and the Receiver Ms. Cook have entered into an agreement about how to handle the SMART disk. The Government had filed a motion to compel a copy from the RCFL, and as a result of the agreement being reached between the Receiver and the Eastern District, and based on the understanding that I will be provided a copy of that so that I can, in turn, provide it to Mr. Ethington in supplemental discovery, we will withdraw that particular motion.

THE COURT: Okay. All right.

Anything else, then, that we need to address?

MR. ETHINGTON: On that SMART disk, we have heard some testimony about the SMART disk. They are tools you stick in a computer so you can do this imaging, I guess, and whatever all they do with it electronically. Is there some idea of time frame on that? Because we are --

THE COURT: Do we have --

MS. GROVES: Ms. Cook could perhaps address that. I believe the agreement with the Eastern District is fairly recent, and I would have to ask her because I have no other information on that.

THE COURT: Ms. Cook, any information on that? He wants to know a time frame as to when he might be able to receive that evidence.

MS. COOK: As quickly as possible. We will get a motion to Judge O'Connor and ask him to rule on an expedited basis. And we recognize the Defense need for this as quickly as possible, and you have my word I will do that.

THE COURT: When do you think you will file a motion with Judge O'Connor?

MS. COOK: It depends on how long we are today, but today or tomorrow.

THE COURT: Today or tomorrow will be fine, and then hopefully in the next few days you can get your copy.

MR. ETHINGTON: Okay. So they have got to have an order. I thought they had an agreement, so they can get it done today or tomorrow, but --

THE COURT: You might want to speak with the Receiver about that when we break here. But she is trying to do it as fast as she can, so maybe you can work something out there.

MR. ETHINGTON: Thank you.

THE COURT: Anything else?

MS. GROVES: No, Your Honor.

THE COURT: Mr. Ethington?

MR. ETHINGTON: No.

THE COURT: Thank you. And Court is adjourned I guess, unless I hear from you and we need a hearing, until the pretrial conference sometime before the trial.

Let me ask the lawyers to come up here a minute.

(The following was had at the bench.)

THE COURT: The case is currently set on a two-week docket on September the 17th. I have an Abilene docket September the 17th. I had to move it from this month. So we will start it on the 24th. So just plan on that, a week later. So we will --

MR. ETHINGTON: No objection.

THE COURT: I think the pretrial conference will likely be the same, but I will look at the date. I don't think that will change. So we will just see you all here at the pretrial conference and take up some of these issues we left --

MR. ETHINGTON: I think we can work together on it.

THE COURT: Okay. Thank you.

(End of hearing.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts 09/12/2012

_____________________________DATE_____________

SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER